# EX. A

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

| | | |
|---|---|---|
| Sharon Weinstock, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 1:23-cv-02824 |
| | ) | |
| The Islamic Republic of Iran | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                    R.J. O'Brien & Associates LLC

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

See Appendix 1

| Place: | Date and Time: |
|---|---|
| Veritext<br>1 N Franklin Suite 2100, Chicago, IL, 60606 | February 5, 2025 9:30 AM |

The deposition will be recorded by this method:        Stenographically and by audiovisual means

❑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    1/15/2025

CLERK OF COURT

                                                                    OR

                                                                    s/ Asher Perlin

_____                    _____
*Signature of Clerk or Deputy Clerk*                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Sharon Weinstock, et al.
_____ , who issues or requests this subpoena, are:
Asher Perlin, 4600 Sheridan St Ste 303, Hollywood, FL 33021-3409, asher@asherperlin.com, (786) 687-0404

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:23-cv-02824

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $         0         .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## **APPENDIX 1**

**Definitions**:

"**RJO US**", "**You**" and "**Yours**" all mean and refer to R.J. O'Brien & Associates LLC.

"**RJOL**" means R.J. O'Brien Limited.

"**Beneathco**" means Beneathco DMCC.

"**Defence**" means the Defence filed by RJOL in the suit brought by Beneathco against RJOL in England (*Beneathco DMCC v. R.J. O'Brien Limited*, Claim No. CL-2024-000328), a copy of which is attached hereto.

**Deposition Topics**:

Your designated witness(es) shall testify on Your behalf about the following matters:

1. The actions taken and activities performed by You on behalf of RJOL, for the benefit of RJOL, and/or pursuant to an agreement or arrangement with RJOL, in respect to the clearing and carrying out of the Beneathco trades. (*See* Defence at ¶ 11 (the Beneathco trades "**were cleared by**" RJO US) and at ¶ 30(e)(iii) (the Beneathco trades were "**carried out**" by RJO US)).

2. Your role and involvement in generating "**the proceeds of trades**" in Beneathco's investments that were "**carried out**" by You. (*Id.* at ¶ 30(e)(iii)).

3. The titles and/or captions, dates of execution, and general subjects and purposes of the written instrument(s) (e.g., contracts, agreements, understandings, decisions, resolutions, etc.) and/or verbal agreements, which established and governed the system, mechanism, and/or arrangement between You and RJOL, pursuant to which You carried out and cleared the Beneathco trades. (*Id.* at ¶¶ 11 and 30(e)(iii)).

During the deposition, Your designated witness(es) shall also identify the sources of the information provided in his/her/their testimony.

Claim No. CL-2024-000328

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

**BENEATHCO DMCC**

**Claimant**

**-and-**

**R.J. O'BRIEN LIMITED**

**Defendant**

_____

**DEFENCE**

_____

## A. Introduction

1. In this document:

   a. Unless otherwise stated, references to paragraph numbers are to those of the Particulars of Claim.

   b. Where appropriate, the Defendant (**RJOL**) will adopt the headings, defined terms and abbreviations used in the Particulars of Claim without thereby making any admissions.

   c. Save where expressly admitted or denied below, RJOL does not admit the facts and matters pleaded in the Particulars of Claim, which the Claimant (**Beneathco**) is required to prove.

## B. Summary

2. As described in more detail below:

   a. Beneathco's claim arises out of its commercial futures trading relationship with RJOL and other companies in the R.J. O'Brien group (the **RJO Group**). The trading started in December 2019.

   b. On 23 January 2020, the US Department of the Treasury's Office of Foreign Assets Control (**OFAC**) made Beneathco a Specially Designated National (an **SDN**) because of Beneathco's role in facilitating contraventions of US sanctions against Iran.

1

  c. After it found out about Beneathco's designation, RJOL refused to follow Beneathco's instruction to transfer to Beneathco the sum of US$16.5 million that RJOL held in an account in the UK on behalf of Beneathco. The transfer would have involved breaches by RJOL, and others, of various US sanctions laws, and would have exposed RJOL to civil and criminal penalties in the US.

  d. RJOL was (and is) not obliged under English law to comply with Beneathco's instruction or to make the transfer. RJOL was (and is) not prohibited from refusing to make the transfer by EU or UK blocking regulations.

  e. RJOL has no intention of retaining the sum of US$16.5 million and/or the additional sum of US$14,135 for longer than necessary. However, as things currently stand, it cannot pay the monies without exposing itself to civil and criminal liability under US law. For that reason (among others), RJOL was (and is) not obliged under English law to comply with Beneathco's instruction or to make the transfer, and this Court should not compel RJOL to make any payment to Beneathco.

  f. As far as RJOL is aware, Beneathco has not taken any steps to apply for a licence from OFAC to permit the payment of the monies or to challenge its SDN designation, despite RJOL suggesting that it do so. If Beneathco contends that the payment is licensable, the appropriate course is for it (as the designated person) to apply for the relevant licence.

## C. The Parties

3. As to paragraph 1:

  a. The first sentence is admitted.

  b. In the form headed "*Corporation/Partnership/Fund/Trust Account*" signed by Shailaja Vasudeva (Director, Beneathco) on behalf of Beneathco on 4 March 2019 (the **Application Form**), Beneathco stated that it traded in petroleum products. Further, Beneathco's financial statements for the year ended 31 December 2017 (which were provided to RJOL on 13 March 2019) state that Beneathco's licenced activity was basic industrial chemicals trading, petrochemicals trading, trading refined oil products abroad, tar and asphalt trading, lubricants and grease trading and chemical fertilizers trading. Otherwise, the second sentence is not admitted.

4. As to paragraph 2:

   a. The first sentence is admitted.

   b. The principal business activity of RJOL is that of broker and clearer on the world's major futures and options and exchanges.

   c. RJOL is and was at all material times authorised and regulated by the Financial Conduct Authority.

   d. RJOL is part of a group of companies that includes R.J. O'Brien (MENA) Capital Limited (**RJO MENA**).

   e. RJOL's issued shares are, and were at all material times, wholly owned by R.J. O'Brien (Europe) Limited, a company incorporated in the UK, which is in turn wholly owned by JVMC Holding Corp, a Delaware corporation with its principal place of business in Chicago, USA.

### D. Background

5.    As to paragraph 3:

   a. As stated in paragraph 3b above, Ms Vasudeva on behalf of Beneathco signed the Application Form on 4 March 2019.

   b. It is admitted that the Application Form stated that "*once we have processed this form we will issue you with account opening documentation which will include terms and conditions of business*".

   c. The Application Form also stated that in signing Beneathco confirmed that it accepted the relevant "Terms of Business", including any annexes. The relevant "Terms of Business" for the relationship between RJOL and Beneathco were those contained in RJOL's Professional Client Agreement dated 17 March 2015 (the **RJOL PCA**), which therefore formed part of the contractual terms between Beneathco and RJOL. The Defendant has not yet located evidence as to the RJOL PCA being sent to Beneathco in 2019.

   d. In the Application Form Beneathco chose US$ as the base currency for their account with RJOL.

6.    As to paragraph 4:

   a. On 30 April 2019, Sayyed Hussain of RJO MENA sent Srinivasan Radhakrishnan, a consultant to Beneathco, an email informing him (among other matters) that the Beneathco account was "*now open*".

3

b. Beneathco first deposited funds in its account on 9 December 2019 (in the sum of US$3.1 million) and trades were first made on 9 December 2019.

c. It is denied that Beneathco and RJOL entered into two contracts. As explained below, they entered into one agreement.

7.  As to paragraph 5:

a. Mr Radhakrishnan was described in the Account Opening Form, and at all material times held himself out, as a consultant to Beneathco. In a letter from Beneathco to RJOL and RJO MENA dated 12 March 2019, Mr Radhakrishnan was described as a "*Trade Consultant*" for Beneathco and listed, along with Edman Nafrieh and Vasudeva Ganiga (both Beneathco personnel), as being authorised to execute trades on its behalf. He completed the document headed "*Account Opening Form for Corporates, Partnerships, Trusts, etc*" (the **Account Opening Form**) on behalf of Beneathco. The Account Opening Form, which was dated 17 March 2019, was executed on behalf of Beneathco by Ms Vasudeva.

b. It admitted that the Account Opening Form contained the statement referred to in the second sentence of paragraph 5.

8.  It is denied that the contractual relationship between the parties was as described in paragraphs 7 to 15. Accordingly, paragraph 6 is denied.

**E. The Contractual relationship between the parties**

9.  The Account Opening Form constituted an offer by Beneathco to receive services from RJOL which RJOL accepted by opening the account on or about 30 April 2019 (the **RJOL Agreement**). The terms of the RJOL Agreement were those contained in the following documents:

a. The RJOL PCA. Paragraph 5c above is repeated.

b. The Application Form.

c. RJOL's best execution policy, as set out in the Best Execution Policy Summary, to which Beneathco consented by Ms Vasudeva signing on 17 March 2019 the consent form appended to the Best Execution Summary for Professional Customers.

d. The Omnibus segregated account choice form, signed by Ms Vasudeva on behalf of Beneathco on 17 March 2019.

e. The document headed "*Terms and Conditions Beneathco SARL dated* 16 April 2019, setting out the applicable fees and charges. This was signed by Ms Vasudeva on behalf of Beneathco on 20 April 2019.

10. Accordingly, it is denied that the parties entered into an "unwritten contract" as alleged in paragraph 7, and that it came into force as alleged in paragraph 8.

11. As to paragraph 9:
    a. It is admitted that Beneathco stated in the Application Form that it traded in petroleum products. Otherwise, the first sentence is not admitted.
    b. Pursuant to the RJOL Agreement, Beneathco entered into derivative contracts on the ICE Futures Europe (**ICE**) exchange.
    c. RJO MENA was Beneathco's broker for the trades. RJOL acted as the clearing firm for Beneathco's executed transactions. As part of that role, RJOL held a cash account for Beneathco to receive margin to cover the risk of losses.
    d. Neither RJOL nor RJO Mena was an ICE clearing member firm. The trades thus were cleared by RJOL's and RJO Mena's US affiliate, R.J. O'Brien & Associates LLC (RJO US). RJO US is an ICE exchange clearing member firm.

12. It is denied that the terms set out in paragraph 10 are to be implied into the RJOL Agreement. They are neither necessary to give business efficacy to the RJOL Agreement nor are they so obvious that they go without saying.

13. Paragraph 11 is denied. Paragraphs 4 to 9 above are repeated.

14. As to paragraph 12:
    a. On 11 March 2019, RJOL sent to Mr Radhakrishnan the document entitled "*Best Execution Policy Summary-Professional Customers*" (the **Best Execution Policy**). RJOL infers that he forwarded it to Beneathco in circumstances where it was signed on behalf of Beneathco on 17 March 2019.
    b. It is admitted the Best Execution Policy stated that "*in order to do business with you, we require your consent to this Policy … Once you have read this Policy, please signify your consent by either emailing consent or sending/ faxing consent*."

5

c. The terms contained in the Best Execution Policy were sent to Beneathco (via Mr Radhakrishnan) in order to obtain its consent for those terms to form part of the contractual relationship between the parties. Paragraph 9 above is repeated.

15. As to paragraph 13:

   a. It is admitted that on 17 March 2019, Beneathco signed and affixed its corporate stamp to the Best Execution Policy to confirm its agreement to the terms contained in that document. It is denied, however, that it formed a separate contract between the parties.

   b. It is admitted that the Best Execution Policy contained the provisions quoted in sub-paragraphs a to e. The Best Execution Policy also stated that "*Delivering Best Execution will be subject to and take account the nature of your order.*"

   c. The terms about best execution relate to the execution of orders for carrying out trades. They are not applicable to instructions for the transfer of a cash sum held on behalf of Beneathco.

   d. In any event, any order subject to best execution is itself subject to the terms contained in the RJOL PCA.

16. As to paragraph 14, it is admitted that on 17 March 2019 Beneathco signed a form in which it chose to open an "**Omnibus Segregated Account**" with RJOL.

17. It is admitted and averred that the parties entered into the RJOL Agreement containing the RJOL PCA. Paragraphs 4 to 9 and paragraph 14 above are repeated.

18. As to paragraph 16:

   a. Paragraph 4 above is repeated.

   b. Sub-paragraphs a to f are admitted except that:

      i. The extract from Clause 1.5 of the RJOL PCA set out in sub-paragraph b is incomplete, as it omits: "*; and (v) such actions that we take or fail to take for the purpose of compliance with any Applicable Regulations shall not render us or any of our directors, officers, employees or agents liable.*"

      ii. Clause 6.1 is not misnumbered. It represented an alternative to the first paragraph 6.1 in the circumstances there described.

   c. The RJOL PCA also contained the following provisions ("*we*" refers to RJOL and "*you*" refers to Beneathco):

i.  Clause 1.6: "*If a… regulatory body takes any action in relation to a Transaction, then we may take any action which we, in our reasonable discretion, consider desirable to correspond with such action or to mitigate any loss incurred as a result of such action. Any such action shall be binding on you. If a Market or regulatory body makes an enquiry in respect of any of your Transactions, you agree to co-operate with us and to promptly supply information requested in connection with the enquiry*".

ii.  Clause 5.13: "*We may, at our entire discretion, arrange for any Transaction to be effected with or through the agency of an intermediate broker, who may be an Associate of ours, and may not be in the United Kingdom. Neither we nor our respective directors, officers, employees or agents will be liable to you for any act or omission of an intermediate broker or agent. No responsibility will be accepted for intermediate brokers or agents selected by you*".

iii.  Clause 5.15: *"You shall observe the standard of behaviour reasonably expected of persons in your position in relation to any relevant Market and not take any step which would cause us to fail to observe the standard of behaviour reasonably expected of persons in our position".*

iv.  Clause 8.2(c): *"You will use all reasonable steps to comply with all Applicable Regulations in relation to this Agreement and any Transaction, so far as they are applicable to you or us".*

v.  Clause 8.2(d): *"You will not… send orders which you have reason to believe are in breach of Applicable Regulations. You shall observe the standard of behaviour reasonably expected of persons in your position in relation to any relevant Market and not take any step which would cause us to fail to observe the standard of behaviour reasonably expected of persons in our position".*

vi.  Clause 13.4: "*We shall not be liable to you for any partial or non-performance of our obligations hereunder by reason of any cause beyond our reasonable control, including without limitation any […] acts and regulations of any governmental or supra national bodies or authorities".*

vii.  Clause 13.7: *"You shall pay to us on demand …on a full indemnity basis any losses, liabilities, costs or expenses (including legal fees), taxes, imposts and levies which we may incur or be subjected to with respect to any of Beneathco's accounts or any transaction or any matching transaction on a market or with an intermediate broker or as a result of any misrepresentation by you or any violation by you of your obligations under the RJOL Agreement (including any transaction) or by the enforcement of RJOL's rights"* (the **Indemnity**).

viii.  Clause 15.1: *"A Transaction which is subject to the Rules of a Market shall be governed by the law applicable to it under those Rules. Subject thereto, this Agreement shall be governed by and construed in accordance with English law."*

ix.  Clause 15.1 *"Interpretation: In this Agreement*
*Applicable Regulations means:*
*…*
*(c) all other applicable laws, rules and regulations in force from time to time.*
*….*
*Transaction: means any transaction subject to this Agreement…"*

7

d. Further or alternatively, the following were implied terms of the RJOL Agreement in order to give the contract business efficacy and/or to represent the obvious intention of the parties to the contract:

  i.  RJOL was not obliged to comply with an instruction that would require an act to be done in a place where it would be unlawful under the law of that place to carry it out (the **Unlawfulness Implied Term**).

  ii.  RJOL was obliged to pay Beneathco on demand the monies standing to its account in the currency of that account (US$), subject to:

   (1)  The payment being net of any obligations owed by Beneathco to RJOL.

   (2)  Its right under clause 1.5 to refuse to carry out an instruction as is necessary to comply with any applicable regulations.

   (3)  Its right under clause 1.6 to take any action which it, in its reasonable discretion, considered desirable to (i) correspond with an action taken by a regulatory body which affects a transaction or (ii) mitigate any loss incurred as a result of such action.

   (4)  The Unlawfulness Implied Term by which RJOL was not obliged to comply with an instruction that would require an act to be done in a place where it would be unlawful under the law of that place to carry it out.

   (5)  The principle derived from _Ralli Bros v Compania Naviera Sota y Aznar_ [1920] 2 KB 287 (the **Ralli Bros Principle**) by which there is no obligation under English law to comply with a contractual instruction that would require an act to be done in a place where it would be unlawful under the law of that place to carry it out.

19. If (contrary to RJOL's case) there was an "Unwritten Contract" of the nature alleged by Beneathco, it was subject to the implied terms identified in paragraph 18d above.

### F.  No fiduciary duties

20. It is denied that the relationship between the parties was one of trust and confidence and that RJOL owed the alleged, or any, fiduciary duties to Beneathco.  In particular:

  a. The parties' relationship was a commercial trading one between sophisticated parties.

8

b. Further, the following terms of the RJOL PCA are inconsistent with a fiduciary relationship:

    i. Clause 1.3, which provides that the RJOL acts as principal and not as agent on behalf of Beneathco.

    ii. Clause 1.5, which provides that RJOL may take or omit to take such actions that it considers necessary to ensure compliance with any applicable regulations and such actions that it takes or fails to take for the purpose of compliance with any Applicable Regulations shall not render RJOL or any of its directors, officers, employees or agents liable.

    iii. Clause 1.6, as set out in paragraph 18ci above.

    iv. Clause 5.4, which provides that RJOL may but shall not be obliged to enter into a Transaction as defined in the PCA.

    v. Clause 5.13, which provides that RJOL may, at its entire discretion, arrange for any Transaction to be effected with or through the agency of an intermediate broker, who may be an associate, and may not be in the UK, and that neither it nor its respective directors, officers, employees or agents will be liable to Beneathco for any act or omission of an intermediate broker or agent.

21. Accordingly, paragraphs 17 and 18 are denied.

22. If, contrary to RJOL's primary case, it owed Beneathco the fiduciary obligations alleged (or any like obligations) those obligations were subject to (and limited by) the matters described in paragraph 18dii above.

**G.  The EU Blocking Regulation and the Retained Blocking Regulation**

23. Paragraphs 19 and 20 are admitted.

24. As to paragraph 21:

a. It is admitted that the EU Blocking Regulation and the Retained Blocking Regulation contain materially the same terms.

b. The differences are largely ones of nomenclature, including (as noted in paragraph 21) the replacement of references to the European Community, and to EU

authorities in the EU Blocking Regulation by reference to the UK and UK authorities in the Retained Blocking Regulation.

25.   Paragraphs 22 to 26 are admitted.  RJOL will say that on the proper construction of the Retained Blocking Legislation and the EU Blocking Regulation a protected person is prohibited from complying with the legislation listed in Annex 1 if and to the extent that a provision has extraterritorial effect on the facts of a case in the sense of applying where there is no nexus between the relevant transaction and/or conduct and US jurisdiction.

### H. Beneathco's US sanctions designation

26.   On 23 January 2020, OFAC designated Beneathco pursuant to section 1(a)(iii)(B) of Executive Order 13846 of August 6, 2018 (**EO 13846**) for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of the National Iranian Oil Company (**NIOC**), which was included on the List of Specially Designated Nationals and Blocked Persons whose property and interests in property are blocked pursuant to Executive Order 13599. Beneathco was thereby made a Specially Designated National. OFAC's notice of designation was released at 12:37 (Eastern Time USA) on 23 January 2020, which was 21.37 (Dubai time) and 17:37 (BST).

27.   In its press release dated 23 January 2020, OFAC stated that Beneathco was designated because it had: (i) in 2019, ordered the transfer of the equivalent of several million dollars to NIOC and; (ii) in 2018, offered to assist NIOC in hiding the origin of Iranian products destined for the United Arab Emirates.

28.   So far as RJOL is aware, Beneathco has never sought to challenge its designation in the US. Even if it had, this Court must proceed on the basis that the designation was and is valid under US law.

29.   Accordingly, paragraph 27 is admitted.

30.   As to paragraph 28:

   a.   Beneathco was designated pursuant to section 1(a)(ii)B of EO 13846. Section 1(b) of EO 13846 provides that as a result of the designation, all Beneathco's property and interests in property that are in the US, that come within the US, or that are or come within the possession or control of any US person are blocked and may not

be transferred, paid, exported, withdrawn, or otherwise dealt in. Section 15 of EO 13846 provides (among other things) that any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition in Section 1(b) of EO 13846 is prohibited.

b. The legislative basis for all those provisions of EO 13846 is section 1702 of the International Emergency Economic Powers Act (**IEEPA**) and section 1621 of the National Emergencies Act (**NEA**).

c. Section 560.211(c)(1) of ITSR contains a blocking provision in the same terms as Section 1(b) of EO 13846. Section 560.203 of ITSR provides (among other things) that any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition in section 560.211(c)(1) of ITSR is prohibited.

d. Section 1705 of IEEPA provides (among other things) that: (i) it is unlawful to violate the prohibitions in EO 13846, section 560.211(c)(i) of ITSR and section 560.203 of ITSR; (ii) a civil penalty may be imposed on a person that violates any of those prohibitions; and (iii) a wilful violation of any of those prohibitions is a criminal offence.

e. It is not a criminal offence under English law for RJOL to comply with these sanctions prohibitions:

    i. The relevant prohibitions in EO 13846 referred to above are not listed in Annex 1 of either the Retained Blocking Legislation or the EU Blocking Regulation.

    ii. The legislative basis for those prohibitions (referred to above) are not listed in Annex 1 of either the Retained Blocking Legislation or the EU Blocking Regulation.

    iii. EO 13846 and sections 560.203 and 560.211(c)(1) of ITSR do not have extraterritorial effect in this case, ie they do not apply where there is no nexus between the relevant transaction and/or conduct and US jurisdiction. There is a nexus here because: (i) the sums held on behalf of Beneathco represent the proceeds of trades carried out by a US company (RJO US); and (ii) payment to Beneathco would necessarily involve a US correspondent bank in the US. If the payment was in US$ it would be made through US clearing. If the US$ sum was first converted into AED,

11

this would involve a US correspondent bank ultimately converting the monies.

31. As to paragraph 29:

   a. OFAC sent a letter to Akrivis Law Group PLLC (**Akrivis Law**) dated 19 April 2022 (the **OFAC Letter**).

   b. The OFAC Letter stated that it was in response to a request by Akrivis Law for OFAC to authorise it to provide advice on US laws, including US sanctions laws and regulations, to Beneathco in relation to its designation and the "*ramification*" for a commercial dispute with RJOL.

   c. The OFAC Letter also stated (among other things) that:

      i. Beneathco had been designated pursuant to section 1(a)(ii) of EO 13846.

      ii. Section 560.211 of the ITSR blocks all property and interests of property of certain blocked persons, including persons designated pursuant to section 1(a)(ii) of EO 13846, if the property or interests in property are or come within the US or the possession or control of a U.S. person.

   d. The OFAC Letter referred to Beneathco as "*any other person whose property and interest in property are blocked pursuant to section 560.211*" of the ITSR.

### I. Subsequent Events

32. As to paragraph 30:

   a. From 9 December 2019, RJOL executed various futures trades on behalf of Beneathco.

   b. It is denied that this was done pursuant to any contracts between RJOL and Beneathco other than the RJOL Agreement, or prior to 9 December 2019.

33. As to paragraph 31:

   a. By an email from Mr Radhakrishnan to Mr Hussain sent at 13:24 (Dubai time) on 23 January 2020, Beneathco requested the transfer of US$8 million to its account at the Commercial Bank of Dubai.

   b. The transfer was completed by RJOL at 16:00 (Dubai time) on 23 January 2020. BeneathCo was designated by OFAC on 23 January 2020 at 12:37 (Eastern Time), which was 21:37 (Dubai time).

12

c.  The RJO Group did not become aware of the designation until 24 January 2020.

34.  As to paragraphs 32 to 34:

a.  At or about 15:23 (Dubai time) on 24 January 2020, Beneathco sent an email to Sayyed Hussain asking him to liquidate one of Beneathco's open positions – namely, in Mar20 Low Sulpher Gasoil Futures. Beneathco held 750 contracts in a short position.

b.  Beneathco's open positions were liquidated during the course of 24 January 2020.

c.  The liquidation of the open positions resulted in a cash balance of US$16,501,515.22, which since 24 January 2020 has been held by RJOL.

d.  After the liquidation of the open positions, Beneathco held offsetting positions in Singapore Jet Kerosene, a long position of 20 contracts in Mini Singapore Jet Kerosene (Platt) Futures and a short position of two contracts in Singapore Jet Kerosene SWP Futures. The contracts offset each other because the commodity and the total volume of the product held in the contracts was the same, and there was no margin risk for RJOL or RJO MENA. Accordingly, these positions were not liquidated on 24 January 2020. These contracts expired on 1 March 2020, resulting in an additional credit to Beneathco's account with RJOL of US$14,135.

e.  Save as above, they are not admitted.

35.  As to paragraph 35:

a.  Under cover of an email dated 24 January 2020, RJO MENA sent to Beneathco an account statement that showed a balance of US$16.5 million.

b.  On the same date, Beneathco replied to RJO MENA's email. Beneathco instructed the remaining balance of US$16.5 million be transferred into their AED account at the Commercial Bank of Dubai (the **Instruction**).  The Instruction was repeated on subsequent occasions between 24 January 2020 and 31 January 2020.

36.  As to paragraph 36:

a.  It is admitted that at the date of the Instruction, Beneathco did not owe RJOL any sum.

b.  RJOL did not transfer the sum of US$16.5 million (or any sum) to Beneathco then or subsequently. However, it is denied that this can properly be described as a failure. For the reasons described in paragraph 45 below, RJOL was and is entitled



under English law and obliged under US law to refuse to transfer the monies held by it on behalf of Beneathco.

37. As to paragraph 37:

    a. Beneathco sent an email on 27 January 2020 in which it asked RJO MENA for the sums held by RJOL to be transferred to an AED account held by Beneathco at ENBD in Dubai.

    b. Mr Hussain replied in an email of 27 January 2020 that he was following up with the team in the UK. In a later email of the same date timed at 15:22 (Dubai time), he said that the matter was with "*our compliance team*".

38. It is admitted that on 31 January 2020, Huong Hauduc, General Counsel EMEA of RJOL, sent an email to Beneathco containing the text quoted in paragraph 38 (the **31 January Email**).

39. The 31 January Email made clear that: (a) the decision to block Beneathco's account was taken following Beneathco's designation under EO 13846 and was made pursuant to EO 13846 and the ITSR; and (b) if Beneathco wished to receive payment it would need to obtain a licence from OFAC. As far as RJOL is aware, Beneathco has not taken any steps to apply for a licence from OFAC to permit the transfer of the monies, despite RJOL suggesting that it do so. If Beneathco contends that the payment is licensable, it is appropriate for it (as the designated person) to apply for the relevant licence. Otherwise, paragraph 39 is denied.

40. Paragraph 40 is admitted. RJOL was and is not obliged under English law to comply with the Instruction.

**J. The Alleged breaches of the EU Blocking Regulation and the Retained Blocking Regulation**

41. Paragraph 41 is admitted save that the prohibition is only to the extent that the annexed provisions have extraterritorial effect in a particular case in the sense of applying where there is no nexus between the relevant transaction and/or conduct and US jurisdiction.

42. As to paragraph 42:

    a. Paragraph 39 above is repeated.

14

b. For the reasons described in paragraph 47 below, compliance with the Instruction would have involved breaches by RJOL of US law.

43. As to paragraph 43:

a. Paragraph 30 above is repeated.

b. Accordingly, it was not, and is not, prohibited for RJOL to rely on those provisions of EO 13846 and/or ITSR. If (contrary to RJOL's primary case) it is prohibited under EU law and/or English law for it to rely on the relevant provisions of one but not both of EO 13846 and ITSR, RJOL will say that its refusal to pay Beneathco was, and is, still justified and lawful under English law.

c. In any event:

i. RJOL is not prohibited from relying on the Unlawfulness Implied Term or the Ralli Bros Principle to refuse to comply with an instruction that would require an act to be done in a place where it would be unlawful to carry it out.

ii. RJOL is entitled to rely on clause 1.5 and 1.6 of the RJOL PCA to refuse to comply with the Instruction, and in doing so it is not thereby complying with the prohibitions but relying on the terms of the RJOL Agreement to resist payment until there is a licence.

44. Accordingly, it is denied, as alleged in paragraphs 44 and 45, that the refusal to comply with the Instruction constituted a criminal offence under the EU Blocking Regulations and/or the Retained Blocking Regulation.

45. It is denied, as alleged in paragraph 46, that any further actions by RJOL which are based on or result, directly or indirectly from the OFAC decision to designate Beneathco as an SDN will constitute a further criminal offence under the Retained Blocking Regulation.

46. Paragraph 47 is noted. However, RJOL has not committed a crime under English law or any other applicable law, and its conduct was not, and is not, contrary to English public policy.

**K. The Alleged breach of Contract**

47. Paragraph 48 is denied.

15

48.   There was no "Unwritten Contract." The RJOL Agreement permitted RJOL to act as it did. In particular:

   a.   There was no obligation to pay Beneathco in AED. The obligation was (subject to the points made in paragraph 18dii above) to pay in the agreed base currency, US$.

   b.   Clause 1.5 of the RJOL PCA permitted RJOL to take any action it considered necessary to ensure compliance with any applicable regulations and provides that such actions that RJOL takes or fails to take for the purpose of compliance with any applicable regulation shall not render it liable.

      i.   EO 13846 and ITSR are applicable regulations as defined in clause 15.1 of the RJOL PCA because they are "*other applicable laws*". EO 13846 and ITSR applied to the Instruction (and therefore were "*applicable*") because:

         (1)   In order to comply with the Instruction, RJOL would have had to first convert US$ into AED, which would have required the involvement of a US correspondent bank in the US. The conversion would have been a violation by RJOL, RJOL's Bank (which was and is National Westminster Bank Plc (**NatWest**)) and the US correspondent bank (and possibly others) of the prohibition in section 1(b) of EO 13846 in breach of section 15 of EO 13846, and a violation by RJOL, NatWest and the US correspondent bank (and possibly others) of the prohibition in section 560.211(c)(1) of ITSR in breach of section 560.203, and unlawful under US law.

         (2)   Further or alternatively, a payment in AED to Beneathco would have had as its effect and/or purpose the evasion or avoidance of the blocking of the funds, since there was no good reason to make the payment in AED rather than US$ other than to evade or avoid payment through the US clearing system, and thereby evade or avoid the operation of section 1(b) of EO 13846 and/or section 560.211(c)(1) of ITSR. This would have been a violation by RJOL (and possibly others) of section 15 of EO 13846 and/or section 560.203 of ITSR, and unlawful under US law

      ii.   RJOL considered and still considers it necessary, in order to comply with EO 13846 and ITSR for it not to pay Beneathco. RJOL has no intention of retaining the sums held on behalf of Beneathco for longer than

necessary. However, as things currently stand it cannot pay the monies without exposing itself to potential civil and criminal liability under US law.

c. Clause 1.6 of the RJOL PCA permits RJOL, where the action of a regulatory body affects a transaction, to take any action, in its reasonable discretion, to correspond with such action.

  i. OFAC's designation of Beneathco was an action by a regulatory authority that affected a transaction within the meaning of clause 1.6, namely the transfer of money to Beneathco following the liquidation of the trades by RJOA. Because of the designation a payment via a US correspondent bank would have been prohibited and would have involved breaches of EO 13846 and ITSR referred to above.

  ii. RJOA is therefore entitled under clause 1.6 to ensure that no sums were paid to Beneathco.

d. Further or alternatively, it was necessary to block Beneathco's account in order to avoid the risk of RJOL or one of its affiliate companies being designated under section 1(a)(iii)(B) of EO 13468, on the basis that the payment to Beneathco would amount to providing material support to a person on the SDN List. RJOL is and was entitled, under clause 1.5 of the RJOL PCA, to rely on this then and relies on it now to justify its continued refusal to pay the Liquidated Sum.

e. Further or alternatively, as the payment to Beneathco would have involved the use of a US correspondent bank in the US in converting the US$ to AED, the payment was illegal under the law where performance was in part required, and therefore by reason of the Unlawfulness Implied Term and/or the Ralli Bros Principle, RJOL was (and is) not obliged under the RJOL Agreement to make the payment and RJOL was and is entitled to refuse to pay the Liquidated Sum in AED (or any sum).

f. A payment to Beneathco in US$ would involve the use of the US clearing system and a US correspondent bank in the US. Such a payment would therefore be a violation by RJOL, NatWest and the US correspondent bank (and possibly others) of the prohibition in section 1(b) of EO 13846 in breach of section 15 of EO 13846 and a violation by RJOL, NatWest and the US correspondent bank (and possibly others) of the prohibition in section 560.211(c)(1) of ITSR in breach of section 560.203, and unlawful under US law. RJOL was and is entitled under clause 1.5 and/or 1.6 of the RJOL PCA not to make such a payment. Further or

17

alternatively, as a payment in US$ to Beneathco would involve the use of the US clearing system and a correspondent bank in the US it would be illegal under the law where performance was in part required, and therefore by reason of the Unlawfulness Implied Term and/or the Ralli Bros Principle, RJOL was (and is) not obliged under the RJOL Agreement to make the payment and RJOL was and is entitled to refuse to pay the Liquidated Sum (or any sum) in US$.

49.  If (contrary to RJOL's case) there were an "Unwritten Contract" of the nature alleged by Beneathco, for the reasons stated in paragraph 48e and f above, RJOL would not be obliged under such an "Unwritten Contract" to make the payment and RJOL was and is entitled to refuse to pay the Liquidated Sum (or any sum).

50.  As to paragraph 49:

    a.  It is denied that RJOL acted in breach of clause 1.3. Clause 1.3 does not state that RJOL is obliged to accept Beneathco's instructions and RJOL does not have an unqualified obligation to act in accordance with Beneathco's instructions. Clause 5.4 permits RJOL to refuse to accept instructions to enter into a transaction. Moreover, clause 1.5 permitted RJOL to take or omit to take any action which it considers necessary to ensure compliance with any applicable regulations.

    b.  RJOL did not breach the EU Blocking Regulation and/or the Retained Blocking Regulation. Paragraph 42 above is repeated.

    c.  In any event, it is denied that Beneathco is entitled to rely on any breach of a prohibition in the EU Blocking Regulation and/or the Retained Blocking Regulation to found a contractual claim against RJOL. It is not a protected person under either the EU Blocking Regulation or the Retained Blocking Regulation.

    d.  It is denied that RJOL breached clause 6.1:

        i.  A failure to repay money does not amount to a breach of rule 7.12.2R. That rule provides for safeguarding rights while holding money. It says nothing about the circumstances in which the holder of the money should repay the money to the client.

        ii.  Rule 7.12.2R has no relevance to the present circumstances. There are no inadequate organisational arrangements in the present case; there is no risk of loss or diminution of the Liquidated Sum or rights in connection with the money; and, moreover, no question of misuse of client money, fraud, poor administration, inadequate record keeping or negligence.

18

        iii.   Clause 6.13 did not apply here. Accordingly, the full repayment obligation was applicable. There was no obligation to repay the Liquidated Sum.

    e.   The claim based on clauses 15.1 and 16.1 is legally misconceived. RJOL is obliged to comply with those provisions of English law that apply to it. However, RJOL does not owe a general obligation to Beneathco under the RJOL Agreement and/or the RJOL PCA to comply with English law. It is necessary for Beneathco to identify a specific provision of English law which it says RJOL has breached and to explain how that gives it a contractual or non-contractual claim against RJOL.

51.   Paragraphs 50 and 52 are denied. The alleged implied term is not necessary to give business efficacy to the RJOL Agreement and nor is it a term which is so obvious that it goes without saying, and therefore it should not be implied into the RJOL Agreement.

52.   As to paragraph 51:

    a.   There is no Best Execution Agreement. As stated in paragraph 9 above, the terms contained in RJOL's best execution policy formed part of the RJOL Agreement.

    b.   It is denied that RJOL is obliged to execute an instruction to pay monies out of the account to a bank account and in a currency of Beneathco's nomination.

    c.   The obligation is to pay money out in the agreed base currency of the account, which was US$. Further or alternatively, the obligation to pay out money (in whatever currency) is subject to: (i) the payment being net of any obligations owed by Beneathco to RJOL; (ii) the right under clause 1.5 of the RJOL PCA not to comply with the instruction; (iii) the right under clause 1.6 of the RJOL PCA to take action to correspond with the action of a regulatory authority; and (iv) the Unlawfulness Implied Term and/or the Ralli Bros Principle.

53.   In the premises it is denied that RJOL has breached and/or is in continuing breach of the Agreement. Accordingly, paragraph 53 is denied.

### L.  The alleged loss and damage

54.   If, contrary to RJOL's case, it acted in breach of contract and/or fiduciary duty as alleged, it is denied that Beneathco has suffered any loss. It is to be inferred that as a result of the designation and the prohibitions in EO 13486 and ITSR referred to above:

    a. A US correspondent bank would have refused to deal with the conversion into AED and therefore would have blocked the payment, even if RJOL had attempted to make it; and/or

    b. NatWest would have refused to make the transfer to Beneathco in whatever currency it was made.

55. As to paragraphs 55 to 56, RJOL will say that any award of pre-judgment interest:

    a. Should not run from 1 May 2021 to 7 June 2024. Beneathco was guilty of inexcusable delay in failing to issue proceedings by 1 May 2021. The parties' lawyers had exchanged letters (included in Beneathco's Initial Disclosure) setting out the parties' respective cases between 12 January 2021 and 14 April 2021, and Beneathco should have issued any action by 1 May 2021.

    b. Should be at 1% above base rate from time to time.

56. Paragraphs 57 and 58 appear to be contradictory. RJOL assumes that Beneathco seeks judgment in US$, as stated in paragraph 58. Subject to the RJOL's case that it is not obliged to make payment and/or that it should not be ordered to make payment, the correct currency of any judgment is US$, for the reasons stated in the first sentence of paragraph 58.

**M.** **The claim for specific performance**

57. Specific performance is inappropriate in the circumstances of the present case. In particular, where: (a) there is no obligation to pay in AED; and/or (b) a payment in US$ would be illegal under US law and would involve illegal acts in the US, as stated in paragraph 48f above, thereby exposing RJOL to potential civil and criminal penalties in the US ; and/or (c) compliance with the Instruction would involve the breaches of EO 13846 and/or ITSR referred to above and illegality in the US through the actions of US correspondent banks, thereby exposing RJOL to potential civil and criminal penalties in the US; and/or (d) it is to be inferred that a US correspondent bank would refuse to deal with the matter thereby making payment impossible; and/or (e) it is to be inferred that NatWest would refuse to comply with an instruction from RJOL to make the payment in whatever currency it was made.

**N.** **Alleged breach of fiduciary duty**

20

58.   RJOL does not owe Beneathco any fiduciary obligations. Accordingly, there can be no question of RJOL's acting in breach of fiduciary duty. Further:

    a.   If RJOL owes a duty of loyalty, it is denied that its refusal to pay the Liquidated Sum amounts to a breach of the duty of loyalty in circumstances where (i) it is entitled to refuse to pay the Liquidated Sum under clause 1.5 and/or clause 1.6 of the RJOL PCA and/or (ii) the Unlawfulness Implied Term and/or the Ralli Bros Principle meant there is no obligation to comply with the Instruction.

    b.   It is denied that in the circumstances its actions were wrongful or unconscionable.

    c.   It is denied that in the circumstances RJOL holds the Liquidated Sum, or any sums, on constructive trust for Beneathco.

### O.  The claimed relief

59.   Accordingly, Beneathco is not entitled to the relief claimed in the prayer, or any relief.

### P. Costs

60. If RJOL is awarded its legal costs of these proceedings, it will rely on its contractual entitlement to indemnity costs under the Indemnity under clause 13.7 of the RJOL PCA and invite the Court, when exercising its discretion to award costs under the CPR, to award costs on the indemnity basis. RJOL reserves the right to make further legal arguments regarding costs in due course.

**Maya Lester KC**

**Paul Wright**

Dated 5 September 2024

### Statement of Truth

The Defendant believes the facts stated in this Defence are true. The Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified in a statement of truth without an honest belief in its truth.

I am duly authorised by the Defendant to sign this statement.

Signed: *Amerjit S Kalirai*

Name: Amerjit Kalirai

Position/office held: Head of Legal, EMEA