UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHARON WEINSTOCK, et al.,

    Plaintiffs – Judgment Creditors,

v.                                               Civ. No. 1:23-cv-02824
                                                         Honorable Matthew F. Kennelly

ISLAMIC REPUBLIC OF IRAN,

    Defendant – Judgment Debtor,

R.J. O'BRIEN LIMITED, JVMC HOLDINGS CORP.,
BRAD GIEMZA and JAMES GABRIELE,

    Citation Third-Party Respondents.

---

**AFFIDAVIT OF STEVEN FREDERICK LOBLE**

**I, STEVEN FREDERICK LOBLE,** of 47 Red Lion Street, London WC1R 4PF state on oath as follows: -

**I.    Professional Background**

1. I am a solicitor and Legal Director in W Legal Limited. I was admitted as a solicitor in March 1984 and practise in the areas of international and commercial litigation. A copy of my Curriculum Vitae is attached hereto as Exhibit 1.

2. Many of my clients are located outside the United Kingdom, and I have acquired substantial experience and expertise dealing with issues that arise in cross-border litigation, such as jurisdictional disputes, enforcement of foreign judgments, obtaining evidence in the United Kingdom for use in proceedings abroad, choice of law, and sovereign immunity.

3. As particularly relevant here, I have been involved extensively in proceedings regarding the enforcement of U.S. and other foreign judgments in England.

1

4. I have represented the government of the United States in a number of cases including in relation to the enforcement of foreign judgments, obtaining evidence for proceedings in the United States of America, state immunity and contract and tort claims.

## II. Nature of this Expert Affidavit

5. Counsel for the Plaintiffs-Judgment Creditors in the above-captioned matter ("Plaintiffs") have requested that I provide my professional opinion regarding several questions of English law, as described below.

6. The bases for my opinion as set forth herein are my academic and professional legal studies, the expertise and experience I have acquired over four decades of practice as a solicitor, and the statutes, case law and authorities cited in this Affidavit.

7. I have no financial interest in the outcome of this case.

## III. The Plaintiffs' Judgment Against Iran Is Not Enforceable In England

8. Counsel for the Plaintiffs have informed me that in the above-captioned proceeding, the Plaintiffs are seeking to enforce their judgment against the Islamic Republic of Iran (respectively: "Judgment" and "Iran") against funds of Beneathco DMCC ("Beneathco") held by R.J. O'Brien Limited ("RJOL").

9. It is a matter of public record that Beneathco has brought a civil action against RJOL in the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (King's Bench Division), in respect to the funds against which the Plaintiffs seek to enforce their Judgment. *Beneathco DMCC v. R.J. O'Brien Limited*, Claim No. CL-2024-000328 (the "English Action").

10. Plaintiffs' counsel have asked me to address whether, as a matter of English law, their Judgment can be enforced in England, either in the context of the English Action or by other means. The answer to this question is definitely negative, as I explain below.

11. I have been provided with a copy of the decision of the United States District Court for the Southern District of Florida, dated April 5, 2019, which ordered entry of the

Plaintiffs' Judgment against Iran. That decision shows that the Plaintiffs' Judgment against Iran arises from a terrorist attack near Jerusalem in which an American citizen was killed, and that the Judgment was entered under section 1605A of the United States Foreign Sovereign Immunities Act. ("FSIA").

12. In *Estate of Heiser v. Islamic Republic of Iran* [2019] EWHC 2074 (QB), the English High Court of Justice considered whether judgments obtained in the same circumstances to the Plaintiffs' Judgment here – i.e., judgments entered against Iran by U.S. federal courts pursuant to section 1605A of the FSIA, in civil actions arising from terrorist attacks against American citizens outside of the United States – can be recognised and enforced in England.

13. The court in Heiser held in a decision issued on 31 July 2019, that such judgments cannot be enforced in England because they fail to satisfy two mandatory requirements of the English Civil Jurisdiction and Judgments Act 1982 ("CJJA"), which govern recognition and enforcement in England of judgments entered against foreign states in courts outside of England. A true copy of the *Heiser* decision is attached hereto as Exhibit 2.

14. Section 31(1) of the CJJA provides that:

> (1) A judgment given by a court of an overseas country against a state other than the United Kingdom or the state to which that court belongs shall be recognised and enforced in the United Kingdom if, and only if—
>
> *(a)* it would be so recognised and enforced if it had not been given against a state; and
>
> *(b)* that court would have had jurisdiction in the matter if it had applied rules corresponding to those applicable to such matters in the United Kingdom in accordance with sections 2 to 11 of the State Immunity Act 1978.

3

15. Thus, section 31(a) sets two cumulative conditions for the recognition and enforcement in England of a judgment entered by a foreign court against a sovereign state defendant (other than the UK or the foreign state in which the court sits).

16. The High Court ruled in Heiser that judgments (such as the Judgment here), entered against Iran by United States courts in FSIA actions arising from terrorist attacks outside of the United States, fail to satisfy both of the conditions set forth in section 31 of the CJJA.

**The Ruling Regarding Section 31(1)(a)**

17. The High Court held that section 31(1)(a)'s requirement that the judgment "would be so recognised and enforced if it had not been given against a state" is to be "determined according to English Common Law principles of private international Law." (Heiser at para. 59-60). These principles require that "the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country."

18. Following a lengthy and highly detailed analysis, the High Court concluded that Iran did not have a presence in the United States. (*Heiser* at paras. 59-91).

19. The court pointed out in this regard that Iran has had no diplomatic missions, consulates, or official residencies in the United States "since the 1980s when the Government [of] Iran was officially expelled from United States' territory." (Heiser at para. 70, note 20).

20. The High Court thus concluded that the judgments did not meet the requirement of section 31(1)(a), and so could not be recognized or enforced in England. (Id. at para. 187).

**The Ruling Regarding Section 31(1)(b)**

21. Under section 31(1)(b), a judgment against Iran entered by a U.S. court will be recognizable and enforceable in England only if the U.S. court "would have had jurisdiction in the matter if it had applied rules corresponding to those applicable to

4

such matters in the United Kingdom in accordance with sections 2 to 11 of the State Immunity Act 1978."

22. The High Court conducted an exhaustive analysis of whether the United States courts that entered the judgments at issue against Iran would have had jurisdiction under sections 2 to 11 of the State Immunity Act 1978. (*Heiser* at paras. 92-187).

23. The court held that none of the judgments, except the judgment in *Acosta v. Iran*, satisfied the provisions of the State Immunity Act. The court found that the U.S. court's exercise of jurisdiction in Acosta conformed with the State Immunity Act because the terrorist attack in Acosta was carried out in the United States (unlike the other judgments before the court, which all arose from attacks outside the United States). (Heiser at paras. 166-174).

24. It is clear therefore that because the Plaintiffs' Judgment here arose from a terrorist attack outside of the United States, it does not satisfy the State Immunity Act. The Judgment thus fails to meet the condition set forth in section 31(1)(b), and for that reason, too, is not recognisable or enforceable in England.

**Enforcement of a foreign judgment in England – general rules**

25. Even if the Defendant in the US proceedings were not a state and thus protected by state immunity, the English court would not enforce the judgment. I should also state that English law does not provide a terrorism exception to state immunity.

26. The grounds on which the English court considers a foreign court has jurisdiction to grant a judgment which an English court will enforce are encapsulated in *Dicey, Morris & Collins on the Conflict of Laws* 16th Ed., the leading textbook (treatise) on English private international law, as follows,

> "**RULE 47**—Subject to Rules 48 and 49, a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment *in personam* capable of enforcement or recognition as against the person against whom it was given in the following cases:
>
> ***First Case*** —If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign

5

country. For a natural person this requires physical presence in the territory, and for a legal person it requires a fixed place of business in the territory.

***Second Case*** —If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.

***Third Case*** —If the person against whom the judgment was given, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.

***Fourth Case*** —Subject to Rule 58, if the person against whom the judgment was given, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country.

## IV. RJOL May Seek to Stay or Dismiss the English Action In Favour of This Action

27. The Plaintiffs' counsel have asked me to address whether under English law a procedural mechanism exists that enables RJOL to seek to have the English Action stayed or dismissed in favour of the proceedings pending in the above-captioned matter. As I explain below, the answer to this question is affirmative.

28. English law permits a defendant in a civil action to move to stay or dismiss the case on forum non conveniens grounds. As the Court of Appeal explained in a decision given on 13 December, 2024, in *Kumar Limbu & Others v Dyson Technology Limited & Others* [2024] EWCA Civ 1564, the "applicable principles" governing a forum non conveniens defence in England "are those established in the seminal decision of the House of Lords in *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460." (*Kumar Limbu*, at para. 1).

29. In Kumar Limbu (a true copy of which is attached hereto as Exhibit 3) the Court of Appeals explained that the *Spiliada* analysis contains two elements:

First, when the defendant is served with the complaint in England (as is apparently the case in the English Action), the "burden is on the defendant to show that there is another available forum which is clearly and distinctly more appropriate." (*Kumar Limbu* at para. 22). The "appropriate" forum in this

6

context "means that in which the case may be tried more suitably for the interests of all the parties and the ends of justice." (*Kumar Limbu*).

Second, if the English court "concludes that the foreign court is more appropriate ... the court will nevertheless retain jurisdiction if the claimant [*i.e.*, the plaintiff] can show by cogent evidence that there is a real risk that it will not be able to obtain substantial justice in the appropriate foreign jurisdiction." (*Kumar Limbu* at para. 23).

30. The Court of Appeal also stated that whilst the English courts sometimes discuss these two elements as a two-stage analysis, in fact the *Spiliada* analysis requires "a single holistic exercise in seeking to identify where the case can most suitably be tried in the interests of the parties and for the ends of justice." (*Kumar Limbu* at para. 23).

31. As noted, under English law an "appropriate" forum is one "in which the case may be tried more suitably for the interests of <u>all the parties</u> and the ends of justice." (*Kumar Limbu* at para. 22, emphasis added). Therefore, "if there is a <u>real risk of denial of justice in a particular forum</u> it is unlikely to be an appropriate one in which the case can most suitably be tried in the interests of the parties and for the ends of justice." (*Kumar Limbu* at para. 23, emphasis added).

32. As I have explained above in this Affidavit, an English court would not recognise or enforce the Plaintiffs' Judgment against Iran. The Plaintiffs thus cannot enforce their Judgment against the Beneathco funds held by RJOL, in an English court. Given that, the Plaintiffs would face a definite "denial of justice" in an English forum, which means that the English forum cannot serve "the interests of all the parties and the ends of justice."

33. The circumstances of *Kumar Limbu* illustrate how the Plaintiffs' inability to enforce their Judgment in England impacts the forum non conveniens analysis. The parties in *Kumar Limbu* disagreed about whether England or Malaysia was the appropriate forum. The Court of Appeals found that the plaintiffs would require litigation funding in order to pursue their claims in Malaysia, which would be not be available. The court thus found that the plaintiffs "will not be able to bring the claims in Malaysia," or at

7

the least "there is a serious risk that that is the case." (*Kumar Limbu* at 63). The court concluded this obstacle "points <u>overwhelmingly</u> in favour of England as the distinctly more appropriate forum." (emphasis added).

34. Conversely, I have been informed by the Plaintiffs' counsel that pursuant to the applicable Illinois and U.S. federal law, Beneathco is entitled to appear in the above-captioned action and litigate its claims to the funds at issue, as part of a single proceeding to which the Plaintiffs, RJOL, and the other Citation Respondents are all parties.

35. The fact that the Plaintiffs cannot enforce their Judgment in an English court, whereas Beneathco and all the other parties can litigate the dispute over the funds in the above-captioned proceeding, "points overwhelmingly in favour of" the United States court "as the distinctly more appropriate forum." (*Kumar Limbu*, at para. 63).

36. An additional factor to be taken into account under the *Spiliada* analysis is "the place where the parties reside or carry on business[.]" (*Kumar Limbu*, at para. 22).

37. I am informed that Beneathco is located in Dubai, the Plaintiffs are Americans, and all the Citation Respondents (other than RJOL) are also located in the United States. Thus, the only party located in England is RJOL. RJOL, despite the US Sanctions, liquidated US assets and transferred the proceeds to England. Some proceeds were transferred to Dubai (paragraph 33 of the Defence). Moreover, in the Defence in the English Action, RJOL itself explicitly argues that the Beneathco funds held by RJOL have a "nexus" to the United States, because those funds "represent the proceeds of trades carried out by a US company." (Defence at para. 30(e)(iii)). Specifically, the trades in the Beneathco funds "were cleared by RJOL's ... US affiliate, R.J. O'Brien & Associates." (at para. 11).[1] These circumstances, too, point to the U.S. court as the more appropriate forum.

38. Another factor supporting the conclusion that the U.S. court is the appropriate forum is the risk of conflicting judgments. The "risk of inconsistent judgments," though not

---

[1] I am informed that the Plaintiffs are providing a copy of RJOL's Defence to this court.

8

dispositive, is "a very important" factor in the forum non conveniens analysis. (*Kumar Limbu* at para. 22).

39. In the "Motion by Non-Party R.J. O'Brien Limited to Quash Plaintiffs' Citation to Discover Assets" filed in the above-captioned proceeding, RJOL asserts that the simultaneous pendency of both the English Action and the above-captioned proceeding presents a risk of conflicting judgments. (at pp. 4, 13-14). This assertion, if true, constitutes a "very important" factor (*Kumar Limbu*, at para. 22) in favour of staying or dismissing the English Action on forum non conveniens grounds, given the ability of all interested parties to pursue their rights and remedies in the U.S. court and the threshold inability of the Plaintiffs to enforce their Judgment in England.

40. There is a question as to whether RJOL and Beneathco entered into a forum selection agreement. In paragraphs 5 and 9 of its Defence in the English Action, RJOL claims that its contractual relationship with Beneathco began in March 2019, and that the terms of the contractual relationship are contained in several instruments, including a "Professional Client Agreement." RJOL admits, however, that it lacks any evidence that it actually sent the "Professional Client Agreement" to Beneathco in 2019. (Defence at para. 5(c)).

41. In its Particulars of Claim ("POC"), Beneathco states (without elaboration) that the "Professional Client Agreement" was "subject to the jurisdiction of the English courts." (POC at para. 15).[2] However, Beneathco, also states in its POC that it first saw the "Professional Client Agreement" only in 2021, when RJOL's lawyers presented it to Beneathco's lawyers. (POC at para. 16). Beneathco's lead position is therefore that RJOL "failed to supply (and accordingly the parties did not enter into)" the terms contained in the "Professional Client Agreement." (POC at para. 15). In other words, Beneathco's primary position in the English Action is that the "Professional Client

---

[2] I am informed that the Plaintiffs are providing a copy of the POC to this court.

9

Agreement" (which it claims includes a forum selection clause), was never entered into by the parties.[3]

42. Given Beneathco's assertion that it was not even aware of the "Professional Client Agreement" until long after it contracted with RJOL in 2019, and its related argument (in the first instance) that it is not a party to the "Professional Client Agreement," in my opinion it would be very difficult for Beneathco to persuade the English court that the forum selection clause purportedly contained therein is a binding provision in a contract between Beneathco and RJOL.

43. However, even assuming that RJOL and Beneathco entered into a forum selection clause, that would not definitively answer the forum non conveniens question in this case. Under English law, courts may disregard a forum selection clause "where the interests of parties other than the parties bound by the exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are part of the relevant dispute so that there is a risk of parallel proceedings and inconsistent decisions." *Donohue v Armco Inc* [2001] UKHL 64, at para. 27 (citing cases). The Plaintiffs are not parties to any forum selection clause between RJOL and Beneathco and, as discussed above, RJOL asserts that there is a risk of inconsistent decisions. Thus, the circumstances described by the House of Lords in *Donohue* are all present here.

44. Additionally, an English court may decline to enforce a forum selection clause when a party seeking a stay or dismissal on forum non conveniens grounds can point to factors that were not foreseeable at the time that it entered into the forum selection clause - see *British Aerospace PLC v. Dee Howard Co.* [1993] 1 Lloyd's Rep 368. I am informed that Beneathco's assets were blocked by the United States in 2020, and that the Plaintiffs initiated the above-captioned proceedings against RJOL to enforce their judgment from the Beneathco assets in 2024. It would be quite reasonable to suggest that RJOL could not have foreseen these events when it contracted with Beneathco in 2019.

---

[3] Beneathco bases its case against RJOL on the terms of the "Professional Client Agreement" only in the alternative. (POC at 15-16).

45. In light of the above, even if RJOL and Beneathco had entered into a forum selection clause (which is questionable given Beneathco's repudiation in the first instance of the "Professional Client Agreement"), the English court would consider that clause as just one of many factors informing its forum non conveniens analysis.

46. Given all the factors and circumstances discussed above, it is my opinion that if RJOL were to file a motion to stay or dismiss the English action in favour of the above-captioned proceeding, it would stand a reasonable chance of prevailing. As noted above, under English law a forum non conveniens analysis requires "a <u>single holistic exercise</u> in seeking to identify where the case can most suitably be tried in the interests of the parties and for the ends of justice." (*Kumar Limbu* at para. 23, emphasis added). Therefore, and given that it might consider additional factors it finds salient, it is difficult to predict how the English court would ultimately rule on such a motion.

**RJOL's position**

47. I understand that RJOL does not claim the amounts sought in the English or US proceedings. Its concern is that it does not wish to run the risk of being made to pay the sums it is holding twice.

48. I have been instructed that RJOL has not sought a stay of the English proceedings on the grounds of forum non conveniens, nor a temporary stay to await the outcome of the US proceedings.

49. I am also instructed that the funds the subject matter of the US and English proceedings were invested through a company associated with RJOL in the United States.

50. In my opinion, RJOL would have a reasonable chance of persuading the English court to stay or dismiss the English Action on foreign non conveniens grounds in favour of the above-captioned proceedings, if it were to file a motion seeking such a remedy.

51. In my view as an English solicitor with experience in transnational litigation, it would be reasonable for RJOL to file such a motion, if it is interested in avoiding the pendency

11

of two proceedings regarding the Beneathco funds and/or the risk of conflicting decisions.[4]

Sworn at 95 ALDWYCH, LONDON, WC2B 4JF, UNITED KINGDOM.

this 5th day of March 2025

Before me



Notary Public
CHARLES EKENG HENSHAW
SCRIVENER NOTARY

JOHN VENN & SONS
SCRIVENER NOTARIES
TRANSLATORS

| | APOSTILLE | |
|---|---|---|
| | (Convention de La Haye du 5 octobre 1961) | |
| 1. | **Country:** Pays / Pais: | United Kingdom of Great Britain and Northern Ireland |
| | **This public document** Le présent acte public / El presente documento público | |
| 2. | **Has been signed by** a été signé par / ha sido firmado por | Charles Ekeng Henshaw |
| 3. | **Acting in the capacity of** agissant en qualité de / quien actúa en calidad de | Notary Public |
| 4. | **Bears the seal / stamp of** est revêtu du sceau / timbre de / y está revestido del sello / timbre de | The Said Notary Public |
| | **Certified** Attesté / Certificado | |
| 5. | **at** á / en — London | 6. **the** le / el día — 7 March 2025 |
| 7. | **by** par / por | His Majesty's Principal Secretary of State for Foreign, Commonwealth and Development Affairs |
| 8. | **Number** sous no / bajo el numero | APO-SQ56-V4W0-NA7K-9PA2 |
| 9. | **Seal / stamp** Sceau / timbre / Sello / timbre | 10. **Signature** Signature / Firma — J. Ingram |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country.

To verify this apostille go to www.verifyapostille.service.gov.uk