**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHARON WEINSTOCK, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 2824** |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiffs, the family members and personal representative of the estate of

Yitzhak Weinstock, obtained a default judgment against the Islamic Republic of Iran

pursuant to the "terrorism exception" of the Foreign Sovereign Immunities Act,

28 U.S.C. § 1605A. *Weinstock v. Islamic Republic of Iran*, No. 17-23272-Civ-Scola,

2019 WL 1507255 (S.D. Fla. Apr. 5, 2019). To attempt to collect the judgment, the

plaintiffs have registered the judgment in this District and have served citations to

discover assets upon respondents R.J. O'Brien Ltd. (RJO UK), its parent company

JVMC Holdings Corp., and two of RJO UK's board members, James Gabriele and Brad

Giemza. The plaintiffs also issued subpoenas to these respondents and to R.J. O'Brien

& Associates LLC (RJO US), an Illinois-based affiliate of RJO UK allegedly involved in

liquidating the futures positions of Beneathco DMCC—an alleged agent or

instrumentality of Iran.

The respondents have moved to quash the citations and the subpoenas. In

response, the plaintiffs have moved for turnover of the assets sought against RJO UK,

and in the alternative against JVMC, Mr. Gabriele, and Mr. Giemza.  For the following

reasons, the Court grants the plaintiffs' motion for turnover against RJO UK and denies

RJO UK's motion to quash.  Because the plaintiffs' motions for turnover regarding the

other respondents were made in the alternative, those motions (and the related citations

and subpoenas) are moot, and the Court does not reach them.

## Background

The plaintiffs are the family members and personal representative of the estate of

Yitzhak Weinstock, a 19-year-old United States citizen who was killed by the terrorist

group Hamas.  They sued Iran in the Southern District of Florida pursuant to the

terrorism exception of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, based

on Iran's material support of Hamas.  The plaintiffs obtained a default judgment of over

$26 million against Iran.  *See Weinstock*, 2019 WL 1507255, at *11.

The Terrorism Risk Insurance Act (TRIA) establishes a comprehensive

mechanism for victims of terrorism to enforce their judgments.  Section 201(a) of the Act

states that "in every case in which a person has obtained a judgment against a terrorist

party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist

party (including the blocked assets of any agency or instrumentality of that terrorist

party) shall be subject to execution" to satisfy the judgment.  Terrorism Risk Insurance

Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (codified at 28 U.S.C.

§ 1610).  The Act further defines a "blocked asset" as "any asset seized or frozen by the

United States . . . under sections 202 and 203 of the International Emergency Economic

Powers Act" (IEEPA).  *Id.* § 201(d)(2)(A).

2

## A.     Beneathco

On August 6, 2018, President Donald J. Trump issued an Executive Order authorizing the Secretary of the Treasury to block the assets of persons or entities found to have materially supported Iran's energy industry.  *See* Exec. Order No. 13,846, 83 Fed. Reg. 38939 (Aug. 6, 2018).  The President issued this Order based in part on the authority granted to him by the IEEPA.  *Id.*

Pursuant to this Executive Order, the United States Department of the Treasury's Office of Foreign Assets Control (OFAC) blocked the assets of Beneathco DMCC on January 23, 2020.  In an official statement published by OFAC, it stated that Beneathco's assets were blocked because it "ordered the transfer of the equivalent of several millions of dollars to [the National Iranian Oil Company]" and because it "offered to assist" Iran "in hiding the origin of Iranian products."  Pls.' Mot. for Turnover, Ex. A at 2.

At the time, Beneathco held several positions on the ICE Futures Europe stock exchange with RJO UK.  A day after OFAC blocked its assets, Beneathco asked its broker, RJO Dubai, to liquidate its positions.  RJO Dubai obliged and executed trades liquidating Beneathco's positions in the RJO UK account, resulting in roughly $16.5 million in funds.  Once trades are executed on the ICE exchange, however, they must be "cleared"—the results of the trades must be recorded and assigned to their respective account owners.  Despite being authorized to trade on the ICE exchange, neither RJO Dubai nor RJO UK are clearing members.  The Beneathco trades were thus cleared through RJO US, RJO UK's Illinois-based affiliate that has a clearing membership.

3

In response to OFAC's blocking of Beneathco's assets, RJO UK prohibited Beneathco from accessing any of the funds in its account. Beneathco subsequently sued RJO UK in the High Court of Justice of England for the frozen funds. That litigation is ongoing.

**B.    This litigation**

The plaintiffs registered their judgment against Iran in this District on May 4, 2023. In an attempt to collect the judgment, the plaintiffs served citations to discover assets of the judgment debtor upon RJO UK, its parent company JVMC Holdings Corp, and two of RJO UK's board members—Brad Giemza and James Gabriele—who live in the United States. The plaintiffs also issued subpoenas to these respondents and RJO US. The basis for these citations and subpoenas was RJO UK's liquidation and holding of Beneathco's assets. The plaintiffs contend that those assets qualify as blocked assets of an agency or instrumentality of a terrorist party under the TRIA, meaning they can be used to satisfy the plaintiffs' judgment against Iran.

The respondents moved to quash the citations and the subpoenas, arguing, among other things, that the Court lacked personal jurisdiction. In response, the plaintiffs moved for turnover of the assets and, in the alternative, to compel limited discovery. On May 28, 2025, the Court concluded the plaintiffs had established a *prima facie* case for personal jurisdiction over the respondents and allowed for limited discovery on that issue. *See Weinstock v. Islamic Republic of Iran*, No. 23 C 2824, 2025 WL 1518118, at *1–2 (N.D. Ill. May 28, 2025) (Kennelly, J.).

Limited discovery has concluded, and both sides have submitted supplemental briefs on the respondents' motion to quash and the plaintiffs' motion for turnover.

4

## Discussion

### A. Personal jurisdiction over RJO UK

For a court to issue a citation to discover assets, the Court must have personal jurisdiction over the citation respondents. *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, No. 17 C 1973, 2021 WL 3077305, at *3 (N.D. Ill. Mar. 25, 2021) (quoting *Leibovitch v. Islamic Republic of Iran*, 852 F.3d 687, 689 (7th Cir. 2017) ("*Leibovitch II*")). The same is true for subpoenas. *Leibovitch II*, 852 F.3d at 689. The plaintiffs bear the burden of "demonstrating the existence of jurisdiction." *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022) (citation omitted).

A federal court, when assessing its personal jurisdiction, ordinarily "follow[s] state law in determining the bounds of [its] jurisdiction over persons." *John Crane, Inc. v. Shein L. Ctr., Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)). "The Illinois long-arm statute permits the court to exercise jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (citing 735 ILCS 5/2-209(c)). Because the Seventh Circuit has found there is no "operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction," the Court analyzes its jurisdiction over RJO UK under the Due Process Clause of the Fourteenth Amendment. *Illinois v. Hemi Grp.*, 622 F.3d 754, 757 (7th Cir. 2010) (citation omitted).

The Supreme Court has "recogniz[ed] two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021).

The plaintiffs do not contend that the Court has general jurisdiction over RJO UK, which is both registered and has its principal place of business in London, England. Still, the Court may exercise jurisdiction over a non-resident corporation if the three requirements of specific jurisdiction are met: "(1) purposeful availment—the defendant must have purposefully directed [its] activities at the forum state or purposefully availed [itself] of the privilege of conducting business in the forum; (2) relatedness—the alleged injury must arise out of or relate to the defendant's forum-related activities; and (3) fairness—the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *B.D. ex rel. Myer v. Samsung SDI Co.*, 91 F.4th 856, 861 (7th Cir. 2024) (per curiam).

### 1. Purposeful availment

"For purposeful availment, the defendant must have 'certain minimum contacts' with the forum state." *Id.* (quoting *Int'l Shoe Co. v. Wash. Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). The "minimum contacts" inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 283–84 (cleaned up). "The defendant's contacts with the state must demonstrate that the defendant purposely availed itself of the laws of that jurisdiction by availing itself of the privilege of doing business in the state or by purposively directing activities at the state." *NBA Props.*, 46 F.4th at 620.

The plaintiffs contend that RJO UK has purposively availed itself of the forum state—Illinois—through its use of its Chicago-based affiliate RJO US to clear the Beneathco trades. The respondents maintain that this use of RJO US's trading license is an insufficient contact because these trades were not directed at Illinois, but at

6

Europe.  They support this contention by noting that Beneathco's account was held in London, the trades were made on the European ICE exchange, and the proceeds from those trades are currently held in a London account.  The use of an Illinois-affiliate's clearing license to make these trades, according to the respondents, was purely "technical."  Reply in Supp. of Mot. to Quash at 4.

Although these arguments indicate that RJO UK's trades were also directed at Europe, they do not show a lack of purposeful availment toward Illinois.  At bottom, RJO UK chose to utilize a corporate entity within Illinois to take advantage of its license to trade on the ICE exchange.  In doing so, RJO UK "invok[ed] the benefits and protections" of Illinois's corporate law through its use of an Illinois-based business's license and thus "purposefully avail[ed] itself of the privilege of conducting activities within the forum state" by clearing trades through that company.  *Cf. Lexington Ins. Co. v. Hotai Ins. Co.*, 938 F.3d 874, 881 (7th Cir. 2019) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)) (cleaned up) (emphasis omitted).

The fact that this connection feels "technical" to RJO UK makes no difference.  Specific jurisdiction requires purposeful availment to ensure, in accordance with due process, "that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted).  Thus a defendant, for example, cannot be "forced to submit to the adjudicatory authority of a state" solely based on its contact with a resident, as a defendant's interactions with an individual who just so happens to be from the forum state does not alone indicate "deliberate contact with the state itself."  *Lexington Ins.*, 938 F.3d at 874.

7

By deliberately utilizing an Illinois-based company for its license to clear trades, RJO UK's interaction with Illinois was not random, fortuitous, or attenuated. RJO UK knew that the ICE exchange required trades to be cleared "pursuant to the rules of [ICE Futures Europe]" when it conducted the Beneathco trades. Decl. of David Russel at 2–3. And although the respondents attempt to downplay the importance of RJO US's involvement in the Beneathco trades, RJO UK admitted in the English High Court that "the sums held on behalf of Beneathco represent the proceeds of trades *carried out by a US company (RJO US)*." Pls.' Mot. for Turnover, Ex. D at ¶ 30(e)(iii) (emphasis added). RJO UK thus made the purposeful choice to engage with an Illinois business and benefit from the forum state's laws that allow that business to operate.

Nor is it jurisdictionally relevant that most of RJO UK's trading affected Europe. Due process requires minimum contacts, not a majority of any given transaction. *See Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 399 (7th Cir. 2020) ("There is no per se requirement that the defendant especially target the forum in its business activity . . . ."). The Seventh Circuit has made clear that even a "single sale" can provide the minimum contact required for specific jurisdiction if that sale evidenced "purposefully directed" conduct at the forum state. *NBA Props.*, 46 F.4th at 624–25.

The respondents attempt to resist this conclusion by arguing that use of a clearinghouse alone cannot amount to minimum contacts with the forum state. None of the cases they cite stand for this proposition. In *Geldermann, Inc. v. Pinkham*, No. 86 C 5787, 1986 WL 15107 (N.D. Ill. Dec. 19, 1986), the defendant traded commodities with Techvest, a trading broker located in Maine. *Id.* at *1. Techvest then cleared its commodities through the clearinghouse Geldermann, Inc., located in Chicago. *Id.*

When the trades resulted in a negative balance and the defendant refused to cover the losses, Geldermann attempted to sue the defendant in Illinois. *Id.* The district court found it lacked personal jurisdiction due to the absence of minimum contacts. *Id.* It emphasized that the defendant "never spoke with, wrote to, or dealt with any person from" Illinois and that all of the trades were "executed by Techvest in New York" on a New York stock exchange. *Id.* Most importantly, because the "[d]efendant was solicited to open an account by Techvest," the defendant lacked any direct, purposeful contact with Illinois as the defendant "did not actively seek out Geldermann." *Id.*

The respondents latch onto the district court's statement that all trades were executed on an out-of-state exchange in an attempt to analogize this case to *Pinkham*. Yet they fail to recognize that RJO UK is not in the same position as the defendant was in *Pinkham*. The defendant in *Pinkham* was not a broker like RJO UK, but the customer of the broker Techvest. The district court was thus correct to find that the defendant did not purposefully avail itself of Illinois by having its commodity trades cleared through Geldermann—it was Techvest that was making the purposeful connection with Illinois by using an Illinois clearinghouse, not the defendant. In this case, RJO UK did actively seek out the clearinghouse RJO US to use its clearing license, thus purposefully availing itself of Illinois.

The respondents' reliance on *Straits Financial, LLC v. Ten Sleep Cattle Co.*, No. 12 C 6110, 2013 WL 12618433, at *4 (N.D. Ill. Feb. 8, 2013), is also unpersuasive. In *Straits*, the district court found the defendant had purposively availed itself of the forum state of Illinois by making "[a]ll of the trades . . . on the Chicago Mercantile Exchange" and having all "payment obligations" made to Illinois brokers. *Id.* at *4. These contacts

are certainly sufficient to show purposeful availment, but nowhere did the district court find they were necessary. Again, a single sale can be sufficient to show personal jurisdiction if it demonstrates that the defendant "purposefully directed its conduct" at the forum state. *NBA Props.*, 46 F.4th at 624–25. Through the deliberate use of an Illinois-based clearinghouse, RJO UK has benefited from the corporate laws of Illinois and thus purposefully availed itself of the forum state.

Finally, the respondents' citations to Seventh Circuit cases cautioning against the use of online contacts to establish personal jurisdiction are misplaced. Online contacts are often problematic because they can be initiated by forum-state residents as opposed to the defendant. For example, forum residents' mere ability to access and interact with a defendant's website does not create sufficient contacts with that forum, as these actions do not show a *defendant's* "conduct targeted . . . the state." *See, e.g.*, *be2 LLC v. Ivanov*, 642 F.3d 555, 558–59 (7th Cir. 2011); *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hou. Metroplex*, 623 F.3d 440, 446 (7th Cir. 2010). But in this case, RJO UK did take "affirmative action in Illinois" by utilizing the clearing services of its Illinois affiliate. *See Rogers v. City of Hobart*, 996 F.3d 812, 820 (7th Cir. 2021). RJO UK's choice to use an Illinois-based clearinghouse is an action by the defendant— not merely forum residents—that evidences purposeful availment of this forum.

In a last attempt to show a lack of minimum contacts, the respondents contend that use of a clearinghouse cannot be a sufficient contact as it would cause "every single trade RJO UK clears on [the ICE exchange]" to "give rise to personal jurisdiction over RJO UK in Illinois." Resp. to Pls.' Suppl. Br. at 5. But the fact that RJO UK is required to clear its trades does not mean it must utilize an Illinois business to do so.

RJO UK could have utilized any clearinghouse that was an ICE exchange clearing member. The fact that it decided to use a clearinghouse based in Illinois was a purposeful choice to do business in Illinois, availing itself of the forum state's—and this Court's—jurisdiction.

### 2. Relatedness

Still, the plaintiffs must not only provide evidence of RJO UK's minimum contact with Illinois but must also show that "the alleged injury . . . ar[o]se out of or relate[d] to the defendant's forum-related activities." *Samsung SDI*, 91 F.4th at 861. "[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor Co.*, 592 U.S. at 358.

The respondents contend that their contact with Illinois through RJO US is not related to the plaintiffs' claim because the trades conducted did not relate to the underlying terrorism suit. Yet the plaintiffs are correct that the "underlying controversy" in this case is not the terrorism suit, but a supplementary enforcement proceeding to collect on that suit.

"Because supplementary proceedings so closely resemble a cause[] of action, courts treat them as such for the purposes of determining long-arm jurisdiction." *Woolard v. Woolard*, No. 05 C 7280, 2009 WL 3150435, at *5 (N.D. Ill. Sep. 5, 2009) (collecting cases); *see also Resol. Tr. Corp. v. Ruggiero*, 994 F.2d 1221, 1224–25 (7th Cir. 1993) (treating, for the purposes of appellate jurisdiction, "supplementary proceeding[s] to enforce the judgment" as a "free-standing lawsuit"); *Dexia Credit Loc. v. Rogan*, 629 F.3d 612, 632 (7th Cir. 2010) ("For appeal purposes, supplementary

proceedings to enforce judgments are treated as separate, free-standing lawsuits."). This makes sense. When collecting on a judgment, a plaintiff is not limited to the assets of a defendant that were related to an underlying suit. A plaintiff who won a judgment for battery, for example, does not need to show that every asset the plaintiff attempts to collect is somehow "related" to that battery. The parallel argument that plaintiffs who won a judgment based on an act of terrorism must show the assets they attempt to collect "relate" to that terrorist act is equally lacking in merit.

The question in this case is thus not whether RJO UK's contacts are related to the underlying judgment, but whether they are related to the citations at issue in this supplementary proceeding. *See Leibovitch II*, 852 F.3d at 690 (noting that a court may have "'specific' jurisdiction over a corporation if the corporation's activities within the jurisdiction of the court are closely related to the lawsuit, *or, as in this [supplementary proceeding], to subpoenas (or state-court citations . . .)* issued within that jurisdiction") (emphasis added). RJO UK's contact with Illinois through its use of RJO US is clearly related to this supplementary proceeding. The assets the plaintiffs are attempting to collect through these proceedings are the proceeds from RJO UK's trades that it cleared using RJO US. In other words, the claim against RJO UK—that its trades produced assets of a judgment debtor that it currently retains—relates to its clearance of those trades in Illinois through RJO US.

### 3. Fundamental fairness

Finally, "the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *Samsung SDI Co.*, 91 F.4th at 861. The following factors are relevant in determining whether the exercise of jurisdiction is fundamentally

fair and just: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland v. Clifton*, 682 F.3d 665, 677 (7th Cir. 2012) (quoting *Burger King*, 471 U.S. at 477).

Courts are particularly hesitant to exert jurisdiction when the interests of foreign parties are involved. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 115 (1987) (citation omitted) ("Great care and reserve should be exercised when extending our notions to personal jurisdiction into the international field."). In the international context, a court must consider not just the interests of this country's states, but also "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction." *Id.* (emphasis in original) Still, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the [foreign] defendant." *Id.* at 114. And "[a] party's concern that a forum is particularly unfair or inconvenient 'usually may be accommodated through means short of finding jurisdiction unconstitutional.'" *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 477).

With these tenants laid out, the Court considers whether exercising jurisdiction over RJO UK would be fundamentally fair.

### a. Burden on the defendant

The respondents contend that these proceedings are unduly burdensome due to

13

the current UK proceedings involving the same proceeds.  They emphasize that if the English High Court orders RJO UK to disburse the proceeds to Beneathco, that order would conflict with a possible determination by this Court that the proceeds should be given to the plaintiffs.  The respondents contend that RJO UK's inability to follow both orders would open itself up to contempt findings in both jurisdictions.

The Court does not find the possibility that RJO UK being held liable to both Beneathco in the English High Court and the plaintiffs in this case unduly burdensome.  As the Second Circuit has noted, "[t]he possibility that [an entity] could be subject to competing suits in multiple countries is a risk inherent" in participating in "international financial arrangement[s]."  *Peterson v. Bank Markazi*, 121 F.4th 983, 1006–07 (2d. Cir. 2024).  RJO UK chose to clear the Beneathco trades in Illinois despite operating mostly in Europe.  It cannot complain that it may be held liable in both the United States and in the United Kingdom for these trades when it decided to conduct aspects of these trades in multiple jurisdictions.

The respondents attempt to turn this double liability into a catastrophic scenario by arguing that Beneathco's proceeds are a tangible *res*.  In their view, because Beneathco's proceeds are "cash," RJO UK might not be able to abide by both this Court's orders concerning Beneathco's assets and the English High Court's orders.  Yet the plaintiffs have provided evidence of RJO US's disclosures to OFAC that indicate the funds are not tangible, but are instead "held internally on the books of RJO UK."  Pls.' Mot. for Turnover, Ex. F. at 2.  The respondents have provided no contrary evidence indicating that it is holding the proceeds—which again, are $16.5 million—in tangible bank notes.  The fact that the respondents do not want two different courts to hold them

liable to two separate sets of plaintiffs does not mean it cannot abide by both courts' orders.

RJO UK is a sophisticated international financial corporation that works with affiliates in the United States. The Court is confident that it can adequately litigate its interests in this Court. The Court thus finds this factor favors exercising personal jurisdiction.

### b. Forum state's interest

The forum state's interest, on the other hand, does not support exercising personal jurisdiction. Neither the plaintiffs nor RJO UK are Illinois residents, so Illinois has little interest in this dispute. *See Asahi Metal Indus.*, 480 U.S. at 114–15 (finding California's "legitimate interests in the dispute have considerably diminished" because "the plaintiff [was] not a California resident").

### c. Plaintiffs' interest in obtaining relief

The plaintiffs' interest in obtaining convenient and effective relief is immense. Judgments against terrorist organizations are exceptionally hard to collect. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690–91 (7th Cir. 2008) (en banc) ("[T]o *collect* a damages judgment against such a[] [terrorist] organization, let alone a judgment against the terrorists themselves (if they can even be identified and thus sued), is . . . well-nigh impossible.") (emphasis in original); *Leibovitch II*, 852 F.3d at 689 ("But how to collect?"). It is no coincidence that the plaintiffs are still attempting to collect their judgment against Iran over six years later—neither Iran nor its agents or instrumentalities have many assets connected to the United States. This factor thus heavily favors exercising personal jurisdiction.

### d.     Interstate judicial system's interest

Exercising personal jurisdiction in this case is also in the interest of the interstate judicial system.  Again, the plaintiffs have been attempting to collect on their judgment for roughly six years.  This Court's resolution of this enforcement proceeding can move the underlying litigation closer to a conclusion.

### e.     Shared interests of states and nations

As discussed above, the fact that this case involves an international party requires the Court to not just consider the interests of the states, but also those of other nations possibly affected.  *See Asahi Metal Indus.*, 480 U.S. at 115.  Because the assets the plaintiffs attempt to collect in this case are also being litigated in England's High Court of Justice, the United Kingdom undoubtedly has a strong conflicting interest. But a competing foreign interest does not dispositively indicate fundamental unfairness—it is a "case to case" inquiry.  *Id.*

In this case, the United States has a large interest in having this enforcement proceeding litigated to deter terrorism.  It is relevant that the judgment the plaintiffs attempt to enforce in this case was procured under the terrorism exception of the Foreign Sovereign Immunities Act.  The "broader goal of the terrorism exception" is to "alter[] the conduct of foreign nations engaged in terrorism."  *See Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 565 (7th Cir. 2012) ("*Leibovitch I*").  To achieve this goal, Congress has repeatedly amended the terrorism exception to make it more applicable.  *See id.* at 565–68 (discussing the several amendments made to the terrorism exception).  Congress further passed the TRIA to provide a "sweeping mechanism for recovery" on these terrorism-exception actions.  *United States v. All*

16

*Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 621 (7th Cir. 2015). Although the Court must consider other nations' interests, it cannot ignore this nation's own clear interest in having the plaintiffs' judgment enforced.

*      *      *

Weighing all the factors, the Court concludes that it is fundamentally fair and just to exercise personal jurisdiction over RJO UK. The only factor that does not favor exercising jurisdiction is the forum state's interest. But the plaintiffs', the judicial system's, and the United States's interests all favor personal jurisdiction over RJO UK in this proceeding. The mere possibility that RJO UK may face double liability cannot outweigh these interests.

## B.    Service of process

"[V]alid service of process is necessary in order to assert personal jurisdiction over a defendant." *Mid-Continent Wood Prods., Inc. v. Harris*, 936 F.2d 297, 301 (7th Cir. 1991). "Actual notice to the defendant is insufficient; the plaintiff must comply with the directives of Rule 4." *McMasters v. United States*, 260 F.3d 814, 817 (7th Cir. 2001). Federal Rule of Civil Procedure 4(f)(1) requires service upon a non-US entity to be effectuated "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention." Fed. R. Civ. P. 4(f)(1). The Hague Convention allows service by any method allowed by "the internal law of a contracting State." *See* Hague Convention, art. 19, Feb. 10, 1969, 20 U.S.T. 361.

The plaintiffs originally attempted to serve RJO UK pursuant to Illinois law by personally serving two of its board members—Mr. Giemza and Mr. Gabriele. The

respondents pointed out multiple issues with this service. First, Illinois law requires service on an entity's "officer or agent," which does not necessarily include its board members. *See* 735 ILCS 5/2-204. Second, RJO UK is a non-US entity that must be served according to the Hague Convention.

In response to these deficiencies, the plaintiffs had a new citation served upon RJO UK at its registered office in London on January 20, 2025, using an English process server. The respondents contend this service was still deficient, as the citation was picked up only by the head of facilities at RJO UK's office. According to the respondents, service under United Kingdom's laws must be made to a "senior person," not a "lower-level RJO UK employee." Reply in Supp. of Mot. to Quash at 5.

After reviewing both parties' English law experts' reports, the Court finds that service was proper. The respondents are correct that service on a company may be "effected by leaving a document with a person holding a senior position." Second Decl. of Christopher Warren-Smith ¶¶ 3–4 (quoting Civil Procedure Rules, Practice Direction 6A, § 6.1 (U.K.)). But that is not the only method. The United Kingdom's Civil Procedure Rules also allow a company to be served "by any of the methods of service permitted under the Companies Act 2006." Second Aff. of Steven Frederick Loble ¶ 10 (citing Civil Procedure Rules, Practice Direction 6A, § 6.3(2) (U.K.)). The Companies Act, in turn, allows a document to be "served on a company registered under this Act by leaving it at, or sending it by post to, the company's registered office." *Id.* ¶ 13 (quoting Civil Procedure Rules, Practice Direction 6A, § 6.3(2) (U.K.)). It is thus irrelevant what level of employee picked up the citation at RJO UK's registered office. Delivering the citation to the registered office itself effectuated valid service under the United

Kingdom's laws, meaning that service was proper under the Hague Convention.

Because the plaintiffs have established the requirements for specific personal jurisdiction over RJO UK and have effectuated valid service of process, the Court finds it has personal jurisdiction over RJO UK.

## C.     Jurisdiction over Beneathco

In their supplemental brief, the respondents make a separate argument concerning this Court's jurisdiction. They emphasize that the plaintiffs have a claim to Beneathco's assets under the TRIA only if it is an agency or instrumentality of Iran. According to the respondents, the Court cannot make such a determination absent a showing of personal jurisdiction over Beneathco. Because the plaintiffs have not shown Beneathco has minimum contacts with Illinois, the respondents argue, this Court lacks jurisdiction.

The respondents contend that this argument implicates this Court's personal jurisdiction over RJO UK. In reality, this is an argument asserting a lack of personal jurisdiction over Beneathco. Whether the respondents appropriately may assert an argument about lack of personal jurisdiction on behalf of another party—solely in their supplemental brief, no less—is unclear. The Court is unaware of any case in which a party was allowed to assert a personal jurisdiction defense on behalf of another independent party. As discussed below, Beneathco has been given notice of these proceedings. Even if a personal jurisdiction defense could be asserted at this point, Beneathco's failure to do so for itself amounts to a waiver or forfeiture. *Cf. Blockowicz v. Williams*, 630 F.3d 563, 566 (7th Cir. 2010) ("[E]ven when a valid personal jurisdiction defense exists, the defense is waived if the objecting party fails to timely raise it . . . .");

19

*Batton v. Nat'l Ass'n of Realtors*, No. 21 C 430, 2024 WL 4871366, at \*4 (N.D. Ill. Nov. 22, 2024) (concluding that a co-defendant waived any objection to personal jurisdiction when failing to raise it after the other co-defendant independently asserted its own personal jurisdiction defense).

Still, the Court is satisfied that due process does not require separate personal jurisdiction over Beneathco in this supplementary proceeding. This is because the Court is not imposing liability on Beneathco. Instead, the Court is determining whether Beneathco's assets held by RJO UK may satisfy a judgment against Iran.

The Court is aware that the line between finding that Beneathco is an agent and instrumentality of Iran and that Beneathco is liable for the underlying judgment appears thin. But the distinction has important legal differences. The Court in this matter is limited to adjudicating Beneathco's interest in specific assets. Its adjudication will not bind Beneathco in any way beyond those assets—Beneathco will be free to argue in other cases that it is not an agency or instrumentality of Iran even if this Court finds otherwise. *Cf. Johnston v. Arbitrium (Cayman Is.) Handels AG*, 198 F.3d 342, 348–49 (2d. Cir. 1999) (noting that determinations limited to interests in property, such as an *in rem* action, only bind a party regarding its "interest in the property in question"— "decisions on other issues in the *in rem* proceedings cannot bind the party in subsequent *in personam* litigation"). Despite the respondents' arguments otherwise, the Court is thus not exerting "the full powers of the forum State to render judgment against" Beneathco. *See Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 808 (1985); *see also id.* 807–08 (noting that possible *res judicata* implications of an adverse judgment do not necessarily indicate a need for personal jurisdiction).

Of course, Beneathco—as an interested party in the assets—is still entitled to due process when its claim to those assets is being adjudicated. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002). But the due process requirements to adjudicate a claimant's interest in property under the TRIA are not the same as the due process requirements to impose *in personam* liability.

To this Court's knowledge, the Eleventh Circuit is the only federal appellate court to conduct an in-depth analysis of the due process requirements for a TRIA adjudication. *See Stansell v. Revolutionary Armed Forces of Colom.*, 771 F.3d 713, 725–29 (11th Cir. 2014). After concluding foreign nationals did have a Fifth Amendment due process right to their interests in property, the court considered "what due process requires." *Id.* at 725–26. The court started by noting that "post judgment motions and writs typically need not be served on defendants." *Id.* at 726. Yet the court recognized that TRIA determinations are not normal enforcement proceedings. They require two "separate determinations regarding the property being executed: (i) that the asset is blocked, and (ii) that the owner of the asset is an agency or instrumentality of the judgment debtor." *Id.* Although the first requirement could "be definitively established by the fact that OFAC has taken action against the alleged agency or instrumentality," the second requirement demanded "a separate determination in addition to blockage not dispositively decided by OFAC designation." *Id.*

The Eleventh Circuit recognized that an "agency or instrumentality determination carries drastic results," including the "attachment and execution of property." *Id.* These results "undeniably implicate[] due process concerns." *Id.* Yet when considering what process is due, the court only required "notice and an opportunity to be heard in order to

21

rebut the allegations and preserve their possessory interest in blocked assets." *Id.*

The respondents emphasize that the Eleventh Circuit did not expressly consider whether personal jurisdiction was required in addition to notice and an opportunity to be heard. Yet the court was clear that it was considering "what due process requires." *Id.* Nor have courts following *Stansell* required more than notice and an opportunity to be heard when determining whether a claimant is an agency or instrumentality of a terrorist organization. *See, e.g.*, *Caballero v. Fuerzas Armadas Revolucionarias de Columbia*, No. 20-MC-40-LJV, 2021 WL 307558, at *1 & n.2 (W.D.N.Y. Jan. 29, 2021) (finding in an action against the terrorist organization FARC that PDVSA was an agency or instrumentality of FARC after only requiring PDVSA to be given notice and an opportunity to be heard). In fact, the respondents cite no TRIA case—and the Court is unaware of any—that required the plaintiffs to show a court had personal jurisdiction over an alleged agency or instrumentality.

Instead, the respondents attempt to rely on several Fifth Circuit cases that have required courts to have personal jurisdiction over third parties in turnover proceedings before adjudicating those parties' property rights. *See, e.g.*, *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 323–24 (5th Cir. 2006); *Maiz v. Virani*, 311 F.3d 334, 345 & n.10 (5th Cir. 2002); *Resol. Tr. Corp. v. Smith*, 53 F.3d 72, 79–80 (1995). These decisions solely interpret Texas's turnover statute and thus do not implicate this Court's jurisdiction. Although these Fifth Circuit cases reference due process, the due process requirements necessary to make Texas's turnover statute constitutional do not necessarily apply to all judgment enforcement proceedings. This is especially true considering that, in Texas, "[a] turnover order typically issues *without service of*

*citation*." *Bollore S.A.*, 448 F.3d at 324 (quoting *Ex parte Swate*, 922 S.W.2d 122, 125 (Tex. 1996) (Gonzalez, J., concurring)) (emphasis added). Personal jurisdiction may be required for judgment enforcement proceedings that lack sufficient notice to third parties affected, but that is not the situation here.

On April 1, 2025, the plaintiffs provided Beneathco notice of this proceeding by delivering notice to its counsel in England. Pls.' Notice & Proof of Compliance with the Ct.'s Ord. of Mar. 27, 2025 at 1. The respondents question in a footnote whether this is sufficient. Yet the plaintiffs have already attempted other methods of notice, including sending notice to two of Beneathco's listed addresses in Dubai by FedEx. Pls.' Suppl. Mot. for Ord. Pursuant to Sections 2-1402(g) & 12-710(a) of the Code of Civ. P. at 2. Both packages ended up being returned, and the plaintiffs have been unable to locate any further addresses due to the United Arab Emirates's strict local privacy laws. *Id.* With these circumstances in mind, notice to Beneathco's counsel—which is actively representing Beneathco in the English High Court litigation over these same funds—is sufficient.

Lastly, it is noteworthy that the TRIA is a federal statute. This means that any due process rights Beneathco has in determinations made under that statute are dictated by the Fifth Amendment's due process protections, not the Fourteenth Amendment Due Process Clause. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 100–02 (1987) (considering the defendants' Fifth Amendment due process rights when determining whether a district court had personal jurisdiction over defendants who allegedly violated federal securities law); *Stansell*, 771 F.3d at 725 (considering foreign nationals' Fifth Amendment due process rights to challenge findings

under the TRIA).  This distinction is important, as the minimum contacts analysis for personal jurisdiction derives mostly from the Supreme Court's Fourteenth Amendment jurisprudence.  *Fuld v. Palestine Liberation Org.*, 606 U.S. ---, 145 S. Ct. 2090, 2102 (2025) (emphasis in original) (noting that most "modern personal jurisdiction cases . . . have grappled only with the limitations imposed by the *Fourteenth* Amendment on *state* courts").

Just this June, a unanimous Supreme Court held in *Fuld* that the Fourteenth Amendment's minimum contacts analysis is not always required under the Fifth Amendment Due Process Clause.  The Court emphasized that the "due process limitations imposed by the Fourteenth Amendment" are driven by "two principles: (1) treating defendants fairly, and (2) protecting interstate federalism."  *Id.* at 2103 (cleaned up).  "[T]he requirement that a defendant have minimum contacts with the forum State" protects interstate federalism by "ensur[ing] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system."  *Id.* at 2104.

The Court concluded, however, that "interstate federalism concerns . . . do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts."  *Id.*  "The Constitution confers upon the Federal Government . . . both nationwide and extraterritorial authority."  *Id.*  Although a minimum contacts requirement is necessary to prevent states from "transcending the limits of their authority, there is no equivalent ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently

24

belong to it by virtue of its sovereignty." *Id.* (cleaned up). The Court therefore refused "to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment." *Id.* at 2105.

To be clear, the Court is not concluding that *Fuld* automatically grants this Court personal jurisdiction over Beneathco under the Fifth Amendment. The Supreme Court declined to determine what "the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts" are, suggesting that the Fifth Amendment may still impose some jurisdictional limits. *Id.* at 2106. *But see id.* at 2110–21 (Thomas, J., concurring) (arguing that the Fifth Amendment Due Process Clause places no limits "on the Federal Government's power to extend personal jurisdiction over respondents"). And even if Beneathco's due process rights spring from the Fifth Amendment, federal courts are often still limited by the Fourteenth Amendment's due process limitations due to federal service of process rules "ordinarily" requiring the respondent to be "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)).

But that is not always the case. *Fuld* gives one example, in which the federal government authorizes personal jurisdiction "by federal statute." *Fuld*, 145 S. Ct. at 2102 (quoting Fed. R. Civ. P. 4(k)(1)(C)). A possibly more applicable example is Federal Rule of Civil Procedure 4(k)(2): "Federal Claim Outside State-Court Jurisdiction." This rule allows, "[f]or a claim that arises under federal law," "serving a summons or filing a waiver of service" to "establish[] personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of

25

general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). Traditionally, this provision has been applied to "cover persons who do not reside in the United States, and have ample contacts with the nation as a whole, but whose contacts are so scattered among states that none of them would have jurisdiction." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001). That understanding may not apply to Beneathco, who might not have any concrete contacts with any states, let alone scattered amongst them. But it is not clear whether this national-minimum-contacts requirement remains post-*Fuld*, or whether *Fuld* changes the nature of what a national contact entails. *Cf. Fuld*, 145 S. Ct. at 2107–08 (noting that two "nonsovereign foreign entities, both of which have been subject to a series of congressional enactments aimed at deterring terrorism," had "meaningful contacts, ties, and relations with the United States") (cleaned up).

To reiterate, this excursion does not suggest the plaintiffs have shown this Court's personal jurisdiction over Beneathco. The plaintiffs, in fact, do not attempt to argue that this Court has personal jurisdiction over Beneathco. As discussed above, they did not have to. This analysis simply indicates that the respondents' argument that this Court lacks personal jurisdiction over Beneathco due to a lack of minimum contacts—even if personal jurisdiction is required, was properly raised by the respondents, and not forfeited or waived—is not definitively meritorious.

The Court therefore finds that it has sufficient jurisdiction over Beneathco's funds held in RJO UK's account to determine whether Beneathco is an agency or instrumentality of Iran for the purposes of turnover of those funds.

**D.     Abstention**

Next, the respondents argue that even if this Court has jurisdiction, it should

abstain from exercising it.  They cite three abstention doctrines in particular:  *Colorado*

*River*, *Princess Lida*, and international comity.  In general, these doctrines caution

against exercising jurisdiction over a case when its contents overlap or affect other

courts of competent jurisdiction.

This argument, however, ignores the broad applicability of the Terrorism Risk

Insurance Act.  The relevant provision suggests that enforcement actions under the

TRIA take priority over most legal doctrines:

> IN GENERAL.—Notwithstanding any other provision of law, and except as
> provided in subsection (b), every case in which a person has obtained a
> judgment against a terrorist party on a claim based upon an act of
> terrorism, or for which a terrorist party is not immune under section
> 1605(a)(7) of title 28, United States Code, the blocked assets of that
> terrorist party (including the blocked assets of any agency or
> instrumentality of that terrorist party) shall be subject to execution or
> attachment in aid of execution in order to satisfy such judgment to the
> extent of any compensatory damages for which such terrorist party has
> been adjudged liable.

Terrorism Risk Insurance Act, Pub. L. No. 107–297, § 201(a), 116 Stat. 2322, 2337.

Courts "generally have interpreted . . . 'notwithstanding' language to supersede

all other laws," as "a clearer statement is difficult to imagine."  *Cisneros v. Alpine Ridge*

*Grp.*, 508 U.S. 10, 18 (1993) (cleaned up).  The TRIA's "notwithstanding" clause is

particularly broad—"there are no terms that limit this clause's scope."  *All Funds on*

*Deposit with R.J. O'Brien & Assocs.*, 783 F.3d at 62.  In fact, surrounding language only

further bolsters this clause's broad scope, as the Seventh Circuit's analysis makes

clear:

> [W]ords of broad application bookend TRIA's "notwithstanding" clause.

27

> The statute reads in pertinent part: "*In general*.—Notwithstanding any other provision of law . . . *in every case* in which a person has obtained a judgment . . . ." Pub. L. No. 107–297, § 201(a), 116 Stat. 2322, 2337 (emphasis added). The only textual limitation to this broad power is found in subsection (b), which provides for discretionary waivers, on an asset-by-asset basis, when the property is "subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations." *Id.* But neither party contends that subsection applies here.

*Id.* at 621 (emphasis and alterations in original).

Federal appellate courts have thus interpreted the TRIA's "notwithstanding" language to supersede several types of legal constraints, including conflicting law and international treaties. *See id.* at 620 (concluding the "TRIA's broad 'notwithstanding' clause supersedes" conflicting civil forfeiture requirements); *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 23 (D.C. Cir. 2010) (concluding the TRIA's "notwithstanding" clause overrides conflicting Foreign Missions Act prohibitions); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 53–54 (2d Cir. 2010) (concluding the TRIA's "notwithstanding" clause abrogated the Treaty of Amity). This Court in particular has previously concluded that at least one of the cited abstention doctrines—the doctrine of prior exclusive jurisdiction (i.e., the *Princess Lida* doctrine)—is overridden by the TRIA's "notwithstanding" provision. *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 892 F. Supp. 2d 1038, 1045 (N.D. Ill. 2012) (Kennelly, J.) (noting that the TRIA's "reference to 'any other provision of law' encompasses common law doctrines that counsel against two courts exercising jurisdiction over the same property," including the "doctrine[] of prior exclusive jurisdiction"); *cf. United States v. $79,123.49 in U.S. Cash & Currency*, 830 F.2d 94, 99 (7th Cir. 1987) (suggesting that a federal statute could "supersede the rule of prior exclusive jurisdiction"). As this Court has done in the past, the Court finds the TRIA's broad "notwithstanding" provision encompasses and

supersedes abstention doctrines.

Even if this Court did find the TRIA did not override abstention doctrines, none of the cited doctrines justify abstaining in this case. *Colorado River* abstention "authorizes federal courts to defer to parallel . . . court proceedings in exceptional cases where abstention would promote wise judicial administration." *Braid v. Stilley*, 142 F.4th 956, 969 (7th Cir. 2025) (cleaned up); *see also Finova Cap. Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999) (noting that although *Colorado River* abstention is usually implicated "in the context of parallel state court proceedings," "the interests of international comity" require applying it to "foreign court" proceedings as well). It "requires a district court to make a two-part inquiry." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 498 (7th Cir. 2011). "First, the court must determine whether the concurrent . . . actions are actually parallel." *Id.* "If so, the court must consider second whether 'exceptional circumstances' justify abstention." *Id.*

The respondents have not shown that the English High Court litigation is parallel to this litigation. "Two suits are parallel for *Colorado River* purposes when substantially the same parties are contemporaneously litigating substantially the same issues." *Id.* (cleaned up). Although "formal symmetry" is not required, there must still be a "substantial likelihood the [allegedly parallel] litigation will dispose of all claims presented in the federal case." *Braid*, 142 F.4th at 969 (citation omitted).

This litigation and the English High Court's litigation differ in multiple respects. "First, and most simply, the parties are different." *Adkins*, 644 F.3d at 499. The plaintiffs in this suit are the family members and the representative of the estate of Yitzhak Weinstock, while the plaintiff in the English High Court litigation is Beneathco.

29

Beneathco cannot be considered "to represent the interests" of the plaintiffs in this case, either. *See id.* Beneathco's interest is entirely at odds with these plaintiffs—both parties want the rights to the funds held by RJO UK.

More importantly, there is little chance that the English High Court case will dispose of all the claims presented in the present dispute. In the English High Court, Beneathco is asserting claims that RJO UK violated the European Union's asset blocking regulations and breached its contractual and fiduciary duties with Beneathco. *See* Pls.' Mot. for Turnover, Ex. D at 14–21. These claims are entirely distinct from the plaintiffs' claim in this case, which is that, by retaining Beneathco's funds, RJO UK possesses assets subject to turnover. *See also Adkins*, 644 F.3d at 499 (noting that a difference in claims between proceedings indicates proceedings are not parallel). Although the English High Court litigation could possibly affect this Court's determination that RJO UK holds funds subject to turnover, its adjudication concerning RJO UK's regulatory, contractual, and fiduciary duties is unlikely to resolve the plaintiffs' turnover claim in this dispute. The Court therefore finds *Colorado River* abstention does not apply.

The Court is also unconvinced that the doctrine of prior exclusive jurisdiction (*Princess Lida*) applies. This doctrine dictates that "two suits, both of which are *in rem* or *quasi in rem* and require the courts to have possession or control of the same property, cannot proceed at the same time, and the second court must yield to the first." *Ray v. Tabriz*, 110 F.4th 949, 957–58 (7th Cir. 2024). Already there is a problem—the English High Court litigation is not an *in rem* or *quasi in rem* proceeding. The action seeks to adjudicate RJO UK's personal liability to Beneathco for allegedly violating EU

regulations, contractual obligations, and fiduciary duties. It is thus a classic *in personam* action, in that it seeks to "impose[] personal liability or obligation on [RJO UK] in favor of [Beneathco]." *See Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958).

In a footnote, the respondents acknowledge that the English High Court litigation is "technically *in personam*" but argue that because Beneathco seeks specific performance, the action is *in rem* in "character." Mot. by JVMC Holdings Corp., James Gabriele and Brad Giemza to Quash at 6 n.3. The only support the respondents cite for this argument is a Supreme Court case from 1850, which they contend stands for the proposition that "a suit for specific performance involving conveyance of property may be 'not strictly a proceeding *in rem*,' yet 'is, substantially, of that character.'" *Id.* (quoting *Boswell's Lessee v. Otis*, 50 U.S. 336, 348 (1850)). Even if the Court were to ignore the sheer age of this pre-Civil War case (it is eighty-nine years older than the *Princess Lida* case itself), the respondents misquote it. The full quote is: "A bill for specific execution of a contract to convey real estate is not strictly a proceeding *in rem*, in ordinary cases; but where such a procedure is authorized by statute, on publication, without personal service of process, it is, substantially, of that character." *Boswell's Lessee*, 50 U.S. at 348.

As is clear from the full quote, the Supreme Court fully acknowledged that an action for specific performance involving a conveyance of property is not "a proceeding *in rem,* in ordinary cases." *Id.* The Court only found that a particular conveyance of real estate was "substantially" *in rem* in "character" in the specific scenario where the procedure was "authorized by statute, on publication," and "without personal service of process." *Id.* This holding is thus much more circumscribed than the respondents

suggest, and the respondents make no showing that Beneathco's English High Court action fits within its limited scope.

The Court is not aware of any Seventh Circuit case that considered an *in personam* action *in rem* for the purpose of applying the prior exclusive jurisdiction doctrine simply because the relief requested was specific performance. A finding that a related action is *in personam* bars the application of this doctrine, full stop. *See, e.g.*, *Tabriz*, 110 F.4th at 958 ("The prior exclusive jurisdiction doctrine is inapplicable here because the motion for adjudication is *in personam*."); *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 536 (7th Cir. 2018) ("But if one of the two cases is not *in rem* or *quasi in rem*, there is no jurisdictional bar and the case should stay in federal court."); *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939) (noting the prior exclusive jurisdiction doctrine has "no application to a case in federal court . . . wherein the plaintiff seeks merely an adjudication of his right of his interest as a basis of a claim"). The Court therefore finds the prior exclusive jurisdiction doctrine (*Princess Lida*) does not apply.

Finally, international comity does not warrant abstention. "International comity refers to the 'spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.'" *Leibovitch v. Islamic Republic of Iran*, 297 F. Supp. 3d 816, 829 (N.D. Ill. 2018) (quoting *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987)). Out of respect for other sovereign nations, "international comity . . . requires the courts of one nation to avoid, where possible, interfering with the courts of another." *H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827,

848 (7th Cir. 2012).

"[T]he obligation of comity expires," however, "when the strong public policies of the forum are vitiated by the foreign act." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) (citing *Hilton v. Guyot*, 159 U.S. 113, 164 (1895); *cf. United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011) (noting that a foreign sovereign judicial ruling should be given preclusive effect only if the ruling "doesn't offend a strong U.S. policy").  As the Court discussed when determining the fundamental fairness of exercising personal jurisdiction, the United States has a strong interest in having judgments under the terrorism exception enforced.  The only way the terrorism exception can achieve its "broader goal" of "altering the conduct of foreign nations engaged in terrorism" is if it can be used to effectively punish terrorists and their supporters.  *See Leibovitch I*, 697 F.3d at 565.  Congress has thus repeatedly amended the statute to make it more applicable, better effectuating its deterrent purpose by "prevent[ing] state sponsors of terrorism . . . from escaping liability for their sins."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014); *Leibovitch I*, 697 F.3d at 565–68 (discussing the several amendments to the terrorism exception).  Allowing terrorist sponsors and their agents and instrumentalities to avoid responsibility based on international comity concerns would inhibit the deterrent power of the terrorism exception that Congress has consistently attempted to bolster.

The Court recognizes that the United Kingdom is a sovereign whose courts are owed due respect.  But abstention is the exception, not the rule.  "Federal courts have a 'virtually unflagging obligation' to exercise the jurisdiction conferred on them by Congress."  *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 517 (7th Cir. 2001)

33

(quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  This "'heavy obligation' to exercise jurisdiction" means "only the clearest of justifications will warrant dismissal."  *Id.* (quoting *Colo. River*, 424 U.S. at 819–20).  The Court finds that the breadth of the TRIA's "notwithstanding" clause and the inapplicability of the respondents' cited abstention doctrines require this Court to exercise jurisdiction over the plaintiffs' supplementary proceedings.  The Court therefore proceeds to the merits of the turnover motion against RJO UK.

**E.    Merits**

Rule 69 of the Federal Rules of Civil Procedure requires proceedings to execute a money judgment to "accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a)(1).  Both Illinois law and the federal Terrorism Risk Insurance Act are applicable to this proceeding.

"In Illinois, 735 ILCS 5/2-1402 and Illinois Supreme Court Rule 277 govern supplementary proceedings."  *Shales v. T. Manning Concrete, Inc.*, 847 F. Supp. 2d 1102, 1111 (N.D. Ill. 2012).  Section 2-1402 provides the mechanism for a judgment creditor "to discover the assets of a judgment debtor or third party and apply those assets to satisfy the judgment."  *Gibbons v. Kowal*, 2024 IL App (1st) 232124, ¶ 27, 259 N.E.3d 862, 867.  A "judgment creditor serves a citation to discover assets upon a judgment debtor or third-party respondent, pursuant to which the court enters a turnover order."  *United States v. Lindstrom*, No. 16 CR 631, 2025 WL 524028, at *3 (N.D. Ill. Feb. 18, 2025) (citing 735 ILCS 5/2-1402(a)–(c)).

The federal TRIA supplements Illinois's supplementary procedures by providing a

34

"sweeping mechanism for recovery" on terrorism exception judgments under the Foreign Sovereign Immunities Act. *See All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d at 621. Relevant to this proceeding, section 201(a) of the TRIA acts as a "statutory veil-piercing" mechanism. *Weinstein v. Islamic Republic of Iran*, 624 F. Supp. 2d 272, 275 (E.D.N.Y. 2009), *aff'd*, 609 F.3d 43 (2d Cir. 2010). It allows plaintiffs to collect on their judgment not just from the terrorist judgment debtor, but also from any "blocked assets" of any "agency or instrumentality" of the judgment debtor. Terrorism Risk Insurance Act, Pub. L. No. 107–297, § 201(a), 116 Stat. 2322, 2337.

With these statutes in mind, the Court considers the validity of the citation served upon RJO UK.

### 1. Extraterritoriality

The respondents first contend the citation upon RJO UK is invalid because the funds are located outside of Illinois. According to the respondents, Illinois "embraces the generally-accepted principle of statutory construction that a statute can have no extraterritorial effect unless there is a clear intent." Mot. by RJO UK to Quash at 9 (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 184–85, 835 N.E.2d 801, 852–53 (2005)). Because section 2-1402 contains no express reference to applying to assets outside of Illinois, the respondents argue it must not have an extraterritorial effect.

Yet courts have repeatedly emphasized that "[t]he provisions of section 2-1402 are to be liberally construed." *Dexia Credit Loc.*, 629 F.3d at 624 (quoting *Dowling v. Chi. Options Assocs., Inc.*, 365 Ill. App. 3d 341, 347, 847 N.E.2d 741, 746 (2006)). The statute is meant to give courts "broad powers to compel the application of discovered

assets or income in order to satisfy a judgment." *Id.* (quoting *Dowling*, 365 Ill. App. 3d at 347, 847 N.E.2d at 746).

Pursuant to these broad powers, courts in this district have recognized that a citation under Illinois law "generally serves to restrain tangible property of the debtor located within Illinois and *intangible property located anywhere,* as long as the Illinois court has personal jurisdiction over the owner of the debt." *Leibovitch*, 297 F. Supp. 3d at 832 (citing *Park v. Townson & Alexander, Inc.*, 287 Ill. App. 3d 772, 773, 679 N.E.2d 107, 109 (1997)) (emphasis added); *Motorola Sols.*, 2021 WL 3077305, at *5–9 (concluding that the presumption against extraterritoriality did not apply to section 2-1402, as "the Court has broad authority under section 2-1402 of the Illinois Code to enter a variety [of] orders that require[] respondents . . . over which the Court has personal jurisdiction to produce information about [the judgment debtor's] assets and, once found, to effectuate a transfer of those assets to satisfy the judgment"). As discussed above, this Court has personal jurisdiction over RJO UK. It thus has the authority, under section 2-1402, over any intangible property of the judgment debtor possessed by RJO UK that could satisfy the plaintiffs' judgment.

The respondents contend that this Court still lacks authority as the funds requested are not an intangible asset of Beneathco's, but a tangible *res*. Yet, as noted above, the plaintiffs have produced evidence that indicate the funds are not tangible, but are instead "held internally on the books of RJO UK." Pls.' Mot. for Turnover, Ex. F. at 2. Again, the respondents have provided no contrary evidence indicating that the $16.5 million in funds are actually held in tangible bank notes. The Court therefore finds that the Beneathco funds at issue are an intangible asset held by RJO UK that this Court, by

having personal jurisdiction over RJO UK, has authority to restrain under section 2-1402.

### 2.    Veil piercing

Next, the respondents note that Illinois usually does not allow any veil piercing in supplementary proceedings.  It is true that, under section 2-1402, "a judgment creditor may not bring an action to pierce the corporate veil within supplementary proceedings." *Pro. Neurological Servs., Ltd. v. City of Chi. Comm'n on Hum. Rels.*, 2025 IL App (1st) 231705, --- N.E.3d ---.  But even if the Court were to accept that an agency-or-instrumentality finding is akin to corporate veil piercing, section 2-1402 is not the only statute at play.  Although enforcement procedures must usually "accord with the procedure of the state where the court is located," the federal Terrorism Risk Insurance Act "governs to the extent it applies."  *See* Fed. R. Civ. P. 69(a)(1).  By allowing plaintiffs to execute their judgments not just against a terrorist judgment debtor, but that terrorist party's agencies and instrumentalities, the TRIA contemplates supplementary proceedings that involve determining whether a party is an agency or instrumentality of a terrorist judgment debtor.  *See Marron v. Moros*, No. 21-23190-CIV-MORENO, 2023 WL 6356969, at *4 (S.D. Fla. Sep. 29, 2023) (noting that state law "governs the procedure on this post-judgment execution action, except to the extent that [the] TRIA supplements or preempts" state law and that the "TRIA provides the substantive provisions that allow for executing on assets that OFAC has blocked").

### 3.    Turnover

Finally, the respondents contend that the plaintiffs have not produced sufficient evidence to justify RJO UK's turnover of Beneathco's assets.  The "relevant question" in

a turnover proceeding against a third party is "whether the third party is holding assets of the judgment debtor that should be applied to satisfy the judgment." *Door Props., LLC v. Nahlawi*, 2020 IL App (1st) 173163, ¶ 31, 188 N.E.3d 806, 812. The plaintiffs have the "burden of showing that the third-party respondent possesses assets of the judgment debtor." *Id.*

It is undisputed that RJO UK possesses assets of Beneathco. But whether those funds are assets of the judgment debtor, Iran, is yet to be determined. As discussed above, the Terrorism Risk Insurance Act allows the "blocked assets" of "any agency or instrumentality of [a] terrorist party" to satisfy a judgment against that terrorist party. Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337. The TRIA thus "requires two separate determinations regarding the property being executed": (1) "that the asset is blocked," and (2) "that the owner of the asset is an agency or instrumentality of the judgment debtor." *Stansell*, 771 F.3d at 726.

OFAC's blocking of Beneathco's assets pursuant to an Executive Order passed under the authority of the IEEPA satisfies this first requirement. *See id.* (noting the first requirement "can be definitively established by the fact that OFAC has taken action against the alleged agency or instrumentality under . . . the IEEPA"). The second requirement, however, demands "a separate determination in addition to blockage not dispositively decided by OFAC designation." *Id.*

The TRIA does not define the terms "agency or instrumentality." The respondents suggest that the Court should adopt the definitions present in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* Under the FSIA, an "agency or instrumentality of a foreign state" is any entity that (1) is a "separate legal person,

corporate or otherwise," (2) is an "organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision," and (3) is "neither a citizen of a State of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(b).

The federal appellate courts that have considered this issue, however, have not grafted this FSIA definition onto the TRIA.  This is because the FSIA definition only refers to an "agency or instrumentality of a *foreign state*," "whereas, under the TRIA, the entity must be an 'agency or instrumentality of th[e] *terrorist party*."  *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016) (emphasis and alterations in original), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018).  The distinction is critical—"unlike the FSIA, the TRIA permits attachment and execution against individual 'terrorist[s]' and 'terrorist organization[s]' (and *their* agencies and instrumentalities)," not just state actors.  *Id.* (emphasis and alterations in original).   A requirement that an "agency or instrumentality" must be an "organ of a foreign state" in the TRIA context makes little sense when not all terrorist parties are states to begin with.  *See Stansell*, 771 F.3d at 731 (noting that any application of the FSIA agency or instrumentality definition to the TRIA "would create an absurd result and leave [the TRIA] nearly meaningless").

Because "the TRIA unambiguously reaches more broadly" than the FSIA, "it would contravene a plain reading of the TRIA to cabin its reach by applying the FSIA's definition of agency or instrumentality."  *Kirschenbaum*, 803 F.3d at 133.  This is true even when, as in this case, the terrorist party happens to be a foreign state.  "[S]tate sponsors of terrorism may operate with less transparency than other sovereign

countries, making [the] application of [the FSIA definition] unrealistic." *Id.* at 134;

*Stansell*, 771 F.3d at 732 ("Sovereign countries—the parties the FSIA contemplates—

operate with more transparency, and their agencies or instrumentalities are likelier to be

diplomatic organs or state-owned enterprises with clear ownership structures that

makes application of [the FSIA definition] feasible.").  Requiring plaintiffs to show that an

agency or instrumentality of a terrorist state is an "organ" of that state would allow

terrorist actors that "operate in the shadows out of necessity" to avoid asset execution

altogether.  *Stansell*, 771 F.3d at 732.

Recognizing the FSIA's inapplicability, the Second Circuit and the Eleventh

Circuit instead apply the "ordinary meanings" of the terms "agency and instrumentality"

to the TRIA.  *Kirschenbaum*, 830 F.3d at 135; *Stansell*, 771 F.3d at 732.  Based on the

ordinary meanings of these terms, the Second Circuit concluded that an entity could be

an agency or instrumentality of a terrorist party in three ways:  (1) it "was a means

through which a material function of the terrorist party is accomplished," (2) it "provided

material services to, on behalf of, or in support of the terrorist party," or (3) it "was

owned, controlled, or directed by the terrorist party."  *Kirschenbaum*, 830 F.3d at 135;

*see also Stansell*, 771 F.3d at 724 n.6, 732 (approving the district court's use of a

substantially similar test).  The Court therefore adopts this framework when analyzing

whether the plaintiffs have provided sufficient evidence that Beneathco is an agency or

instrumentality of Iran.

To establish that Beneathco is an agency or instrumentality of Iran, the plaintiffs

rely on OFAC press releases explaining its decision to block Beneathco's assets.  In

these press releases, OFAC noted that "[i]n late 2018, Beneathco DMCC offered to

assist the [National Iranian Oil Company] in hiding the origin of Iranian products."  Pls.' Mot. for Turnover, Ex. A at 2.  And throughout 2019, Beneathco "ordered the transfer of the equivalent of several million dollars" to the National Iranian Oil Company.  *Id.*

The respondents challenge the sufficiency of this evidence.  OFAC press releases, according to the respondents, cannot be considered evidence that Beneathco is an agency or instrumentality.  They contend that "courts require *actual* evidence, such as sworn testimony and documentary evidence."  Reply in Supp. of Mots. to Quash at 17 (emphasis in original).

OFAC press releases, however, are admissible evidence that Beneathco is an agency or instrumentality of Iran.  These press releases are undoubtedly relevant—by detailing what actions Beneathco took in relation to Iran that led to its assets being blocked, they have a tendency to indicate that Beneathco provided "material services to, on behalf of, or in support" of Iran.  *See Kirschenbaum*, 830 F.3d at 135; *cf.* Fed. R. Evid. 401 (defining relevant evidence as evidence that has a "tendency" to make a fact of consequence "more or less probable").  And although admitting OFAC statements through documents raises certain hearsay issues, Federal Rule of Evidence 803(8) allows public records to be admissible in a civil case when they include "factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  As other courts have found, OFAC press releases detailing their decision to block an entities assets qualify under this exception.  *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2013 WL 2451067, at *2 & n.3 (S.D.N.Y. June 6, 2013) (finding an OFAC press release explaining a blocking order is a "'statement of a public office' that sets out

41

'factual findings from a legally authorized investigation,' and neither the source of information—here OFAC—nor other circumstances indicate a lack of trustworthiness"); *Stansell v. Revolutionary Armed Forces of Colom.*, No. 19-20896-CV-SCOLA/TORRES, 2020 WL 5547919, at *11 (S.D. Fla. Mar. 23, 2020) (finding an OFAC press release admissible to prove an entity is an agency or instrumentality of a terrorist party under Federal Rule of Evidence 803(8)), *rev'd on other grounds*, 45 F.4th 1340 (11th Cir. 2022).

The respondents offer no contradicting evidence indicating Beneathco did not provide material services to, on behalf of, or in support of Iran.  Absent evidence indicating otherwise, OFAC's blocking order and press releases explaining that order are sufficient to find Beneathco is an agency or instrumentality of Iran.  *See In re 650 Fifth Ave.*, 2013 WL 2451067, at *4 (finding an "OFAC blocking determination and associated materials" "sufficient" evidence to demonstrate an entity is an "instrumentalit[y] of a terrorist party" when left uncontroverted).  The Court thus finds that Beneathco is an agency or instrumentality of Iran whose assets can be executed upon to satisfy a judgment against Iran under the TRIA.

Because RJO UK possesses the assets of the judgment debtor Iran by holding funds owned by Beneathco, an agency or instrumentality of Iran, the Court grants the plaintiffs' motion for turnover of the held Beneathco funds.  The Court therefore does not reach the issues regarding the alternative citations issued to JVMC, Mr. Giemza, or Mr. Gabriele, as RJO UK's turnover of Beneathco's assets renders them moot.

## Conclusion

For the reasons stated above, the Court grants the plaintiffs' motion for turnover

regarding RJO UK [dkt. 31] and denies RJO UK's motion to quash [dkt. 13].  The Court

orders RJO UK to turn over the roughly $16.5 million it is holding on behalf of

Beneathco.  This turnover order renders all of the subpoenas and citations to JVMC, Mr.

Giemza, and Mr. Gabriele moot [dkt. 14].  Plaintiffs are directed to provide a form of

judgment, reviewed by respondents for form, by August 11, 2025.  It should be sent in

Word format to the undersigned judge's proposed order e-mail address.

Date:  August 7, 2025

_____
MATTHEW F. KENNELLY
United States District Judge